**Johann BREYER**

v.

**Doris MEISSNER, U.S. Immigration and Naturalization Service.**

**Civil Action No. 97–6515.**

United States District Court,
E.D. Pennsylvania.

Aug. 27, 1998.

Willan Franklyn Joseph, Philadelphia, PA, for Plaintiff.

David F. Legge, U.S. Dept. of Justice, Civil Div., Torts Branch, Washington, DC, Gretchen M. Wolfinger, U.S. Dept. of Justice, Civil Div., Washington, DC, for Defendant.

## MEMORANDUM AND ORDER

YOHN, District Judge.

Plaintiff Johann Breyer was denaturalized by order of this court in 1993, as a consequence of his service during World War II in the SS *Totenkopf* (Death's Head) Battalion as an armed guard at the Buchenwald and Auschwitz concentration camps. Breyer now seeks a declaratory judgment that he is entitled to derivative United States citizenship because his mother was born in the United States. Defendant has moved to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons set forth below, I will grant defendant's motion to dismiss.

## STANDARD OF REVIEW

When considering a defendant's motion under Rule 12(b)(6) to dismiss a complaint for failure to state a claim upon which relief can be granted, the court "must consider only those facts alleged in the complaint and accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir.1994) (citing *Hishon v. King & Spalding,*

467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)). The plaintiff is entitled to the benefit of "every favorable inference that can be drawn from those allegations." *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir.1991). The court, however, is "not required to accept legal conclusions either alleged or inferred from the pleaded facts." *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993).

Along with the allegations contained in the complaint, the court may consider exhibits attached to the complaint, and matters of public record. *Pension Benefit Guaranty Corp. v. White Consol. Indus. Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993). The allegations may be supplemented by any relevant matter that can be judicially noticed. *Wishnefsky v. Addy,* 969 F.Supp. 953, 954 (E.D.Pa.1997) (citing *Oneida Motor Freight, Inc.. v. United Jersey Bank,* 848 F.2d 414, 416 n. 3 (3d Cir.1988); 5A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1363 (2d ed.1990)).

The motion to dismiss should be granted "only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.,* 140 F.3d 478, 483 (3d Cir.1998) (citing *ALA,* 29 F.3d at 859).

## BACKGROUND

### I. Factual Background

The following account is drawn in part from plaintiff's allegations in his amended petition. Plaintiff's allegations are supplemented, where noted, by relevant adjudicative facts drawn from related proceedings in this court and the United States Court of Appeals for the Third Circuit.

Plaintiff Johann Breyer alleges that he was born in Neuwalddorf, Czechoslovakia, on May 30, 1925. His mother was a citizen of the United States.[1]

Breyer lived in Europe until May 1952, when he entered the United States on an immigrant visa as a permanent resident. In August 1957, Breyer applied to become a naturalized citizen of the United States, and was issued a Certificate of Naturalization. He has been a resident of Philadelphia, Pennsylvania, for approximately 45 years.

In April 1992, the United States filed a denaturalization action against Breyer, seeking the revocation of Breyer's admission to citizenship. On July 6, 1993, this court found that Breyer's entry visa into the United States was invalid, and his citizenship illegally procured, because he assisted in Nazi persecution and because he was a member of a movement hostile to the United States. *United States v. Breyer,* 829 F.Supp. 773, 778–79 (E.D.Pa.1993) (hereinafter *"Breyer I"*), aff'd in part and vacated in part, 41 F.3d 884 (3d Cir.1994). On December 20, 1993, this court ordered the revocation of plaintiff's naturalization, and the cancellation and surrender of his Certificate of Naturalization. *United States v. Breyer,* 841 F.Supp. 679, 686–87 (E.D.Pa.1993) (hereinafter *"Breyer II"*), aff'd in part and vacated in part, 41 F.3d 884 (3d Cir.1994). The Third Circuit affirmed this court's judgment and orders relating to the revocation of plaintiff's naturalization. *United States v. Breyer,* 41 F.3d 884, 888–91 (3d Cir.1994) (hereinafter *"Breyer III"*).

Plaintiff attempted to obtain a Certificate of Citizenship from the Immigration and Naturalization Service ("INS"), filing an application pursuant to § 341 of the Immigration and Nationality Act, 8 U.S.C. § 1452. The application was denied, and the Administrative Appeals Unit affirmed the denial in

---

1. Following a bench trial in a related case, focusing on the birthplace of plaintiff's mother, this court concluded that plaintiff's mother was a citizen of the United States. *United States v. Breyer,* 841 F.Supp. 679, 684–85 (E.D.Pa.1993), aff'd in part and vacated in part, 41 F.3d 884 (3d Cir.1994). The Third Circuit vacated that portion of this court's decision because plaintiff had not exhausted his administrative remedies. Be- cause plaintiff's allegations of fact are accepted as true for purposes of the motion to dismiss, those proceedings have no bearing on the instant motion. Plaintiff has never alleged that his father was a United States citizen, and such an allegation would be inconsistent with the relief plaintiff seeks with respect to provisions of section 1993 of the Revised Statutes of 1874.

an opinion issued October 15, 1996. Upon plaintiff's timely motion for reconsideration, a final administrative denial issued on December 30, 1996. Plaintiff has now exhausted his administrative remedies.

On January 22, 1997, the INS and the United States Department of Justice, Office of Special Investigations ("OSI") instituted deportation proceedings against plaintiff. On December 15, 1997, an immigration judge found plaintiff to be deportable. Plaintiff now petitions this court pursuant to 8 U.S.C. § 1503(a) for a declaratory judgment of citizenship.

## II. Statutory Background

At the time of plaintiff's birth on May 30, 1925, section 1993 of the Revised Statutes of 1874 governed the ability of United States citizens to transmit that citizenship to their children born outside the United States:

> All children heretofore born or hereafter born out of the limits and jurisdiction of the United States, whose fathers were or may be at the time of their birth citizens thereof, are declared to be citizens of the United States; but the rights of citizenship shall not descend to children whose fathers never resided in the United States.

R.S. § 1993. Gender-based distinctions had existed in the law since 1790, allowing only a citizen father who had at one time resided in the United States to transmit his United States citizenship *jure sanguinis* (by right of blood) to a foreign-born child. See *Montana v. Kennedy*, 366 U.S. 308, 311, 81 S.Ct. 1336, 1339, 6 L.Ed.2d 313 (1961) (citing Act of Feb. 10, 1855, ch. 71, § 1, 10 Stat. 604); *Wauchope v. United States Dep't of State*, 985 F.2d 1407, 1409 n. 1 (9th Cir.1993) (citing Act of Apr. 14, 1802, ch. 28, § 4, 2 Stat. 155; Act of March 26, 1790, 1 Stat. 103).

■ In 1934, Congress amended R.S. § 1993 to provide that "[a]ny child hereafter born out of the limits and jurisdiction of the United States, whose father or mother or both at the time of the birth of such child is a citizen of the United States, is declared to be a citizen of the United States," subject to certain residency requirements. Act of May 24, 1934, ch. 344, § 1, 48 Stat. 797. Generally, "[t]he applicable law for transmitting citizenship to a child born abroad when one parent is a U.S. citizen is the statute that

was in effect at the time of the child's birth." *United States v. Viramontes–Alvarado*, 149 F.3d 912, 915–16 (9th Cir.1998) (quotation omitted). By its use of the phrase "hereafter born," Congress expressly chose not to apply the 1934 amendment retrospectively to persons who were born prior to its enactment. See *Wauchope*, 985 F.2d at 1410. For an individual born before May 24, 1934, the prior version of R.S. § 1993 remained "the sole source of inherited citizenship status for foreign-born children of American parents." *Kennedy*, 366 U.S. at 312, 81 S.Ct. at 1339.

However, in October 1994, after this court's decision in *Breyer II* and prior to the Third Circuit's decision in *Breyer III*, Congress passed the Immigration and Nationality Technical Corrections Act of 1994 ("INTCA"), Pub.L. No. 103–416, 108 Stat. 4305 (1994). In section 101 of INTCA, Congress added a new section 301(h) to the INA, which, in effect, made the 1934 amendment to R.S. § 1993 retroactive by conferring citizenship at birth upon

> a person born before noon (Eastern Standard Time) May 24, 1934, outside the limits and jurisdiction of the United States of an alien father and a mother who is a citizen of the United States who, prior to the birth of such person, had resided in the United States.

8 U.S.C. § 1401(h). This amendment retroactively addressed the gender distinction in R.S. § 1993 that had recently been discussed by the Ninth Circuit in *Wauchope* and by this court in *Breyer II*. However, Congress elected to limit the retroactive grant of citizenship by enacting section 101(c)(2) of INTCA:

> The retroactive application of the amendment ... shall not confer citizenship on, or affect the validity of any denaturalization, deportation, or exclusion action against, any person who is or was excludable from the United States under section 212(a)(3)(E) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(E)) (or predecessor provision) or who was excluded from, or who would not have been eligible for admission to, the United States under the Displaced Persons Act of 1948

or under section 14 of the Refugee Relief Act of 1953.

Pub.L. No. 103–416, § 101(c)(2), 108 Stat. at 4306. Section 13 of the Displaced Persons Act of 1948 ("DPA") provides, in relevant part:

> No visas shall be issued under the provisions of this Act, as amended, to any person . . . who is or has been a member of or participated in any movement which is or has been hostile to the United States or the form of government of the United States, or to any person who advocated or assisted in the persecution of any person because of race, religion, or national origin. . . .

Pub.L. No. 80–774, § 13, 62 Stat. 1009, 1014, amended by Pub.L. No. 81–555, 64 Stat. 219, 227 (1950). The provisions referenced in INTCA also include 8 U.S.C. § 1182(a)(3)(E), under which any person who participated in Nazi persecutions or genocide is inadmissible.

These restrictions in section 101(c)(2) of INTCA preclude the application of the newly added 8 U.S.C. § 1401(h) to people within their scope, so that citizenship at birth is not retroactively conferred upon people excludable or inadmissable under the referenced statutory provisions.

## EFFECTS OF PRIOR ADMINISTRATIVE AND JUDICIAL PROCEEDINGS

### I. Plaintiff's Request for Conversion to Motion for Summary Judgment

■ Defendant has cited two decisions of its Administrative Appeals Unit ("AAU") in its motion to dismiss, and attached them as exhibits to the motion. Attached to the motion as Exhibit A is the AAU's decision of October 15, 1996. Attached as Exhibit B is the AAU's final decision of December 30, 1996, which was also attached to plaintiff's amended petition. Plaintiff urges that because defendant has introduced the October 15, 1996 decision into the record, this court must view defendant's motion as one for summary judgment. I will decline to do so.

■ In considering a motion under Rule 12(b)(6), the court may consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit*, 998 F.2d at 1196. Plaintiff does not dispute the authenticity of the document, and plaintiff's claims are based at least in part upon the AAU decision. (See Pl.'s Amended Pet. at ¶ 19.) Furthermore, judicial notice may be taken of decisions of government agencies and administrative bodies without converting a motion to dismiss into a motion for summary judgment. *Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.*, 969 F.Supp. 907, 915 (D.N.J.1997) (citing *Pension Benefit*, 998 F.2d at 1197). Indeed, the court has a positive obligation to take judicial notice of relevant determinations in other courts, "both within and outside of the federal judicial system, if the proceedings have a direct relation to matters at issue." *Opoka v. I.N.S.*, 94 F.3d 392, 394 (7th Cir.1996) (reviewing Board of Immigration Appeals decision). However, "a court may take notice of another court's order only for the limited purpose of recognizing the 'judicial act' that the order represents or the subject matter of the litigation." *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir.1994).

I will take judicial notice only that the AAU rendered a decision on October 15, 1996 denying plaintiff's application for a Certificate of Citizenship, and that upon reconsideration, the AAU issued a final administrative denial on December 30, 1996. These adjudicative facts are wholly consistent with plaintiff's allegations. (Pl.'s Amended Pet. ¶¶ 18–19.) I will accord no consideration or deference to the factual findings of the AAU or to the legal reasoning of the AAU's decisions. See *Opoka*, 94 F.3d at 395.

### II. Plaintiff's Ineligibility for Admission Under the Displaced Persons Act

■ In a prior proceeding involving plaintiff, the United States Court of Appeals for the Third Circuit affirmed this court's decision that Breyer was ineligible for admission to the United States under section 13 of the Displaced Persons Act of 1948, because he assisted in Nazi persecution and because he was a member of a movement hostile to the United States. *Breyer III*, 41 F.3d at 889–91; *Breyer I*, 829 F.Supp. at 777–79.

■ A district court deciding a Rule 12(b)(6) motion is entitled to take judicial notice of the factual record of a prior proceeding. *Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 416 & n. 3 (3d Cir.1988); see also *Senior Loiza Corp. v. Vento Development Corp.,* 760 F.2d 20, 25 (1st Cir.1985) (district court may properly notice facts set forth in appellate opinion regarding same party in related case) (citing *Shuttlesworth v. Birmingham,* 394 U.S. 147, 157, 89 S.Ct. 935, 942, 22 L.Ed.2d 162 (1969)). It has often been observed that "[j]udicial notice is particularly applicable to the court's own records of prior litigation closely related to the case before it." *Anderson v. Cramlet,* 789 F.2d 840, 845 (10th Cir.1986) (quotation omitted); *Cash Inn of Dade, Inc. v. Metropolitan Dade County,* 938 F.2d 1239, 1243 (11th Cir.1991); *United States v. Jackson,* 640 F.2d 614, 617 (8th Cir.1981). A court may "take judicial notice, whether requested or not ... of its own records and files, and facts which are part of its public records." *Id.* (quotation omitted). Accordingly, for purposes of this motion to dismiss, I will take judicial notice of relevant portions of this court's record in the prior proceeding, and of the legal and factual determination of this court, as affirmed by the Third Circuit, that Breyer was ineligible for admission to the United States under section 13 of the DPA on the grounds that he assisted in Nazi persecution, and was a member of a movement hostile to the United States. *Breyer III,* 41 F.3d at 889–91; *Breyer I,* 829 F.Supp. at 777–79.

■ Defendant has asserted that in the present action, plaintiff is collaterally estopped from challenging the court's prior determination of those issues.[2] Under the doctrine of collateral estoppel or issue preclusion, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits involving a party to the prior litigation." *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). This applies to both issues of law and issues of fact conclusively determined in the prior action. *United States v. Stauffer Chemical Co.,* 464 U.S. 165, 170–71, 104 S.Ct. 575, 578, 78 L.Ed.2d 388 (1984). The requirements of issue preclusion are satisfied where: (1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action. *Raytech Corp. v. White,* 54 F.3d 187, 190 (3d Cir.1995).

In plaintiff's response to the motion to dismiss, he does not expressly challenge the Third Circuit's determination of this issue, nor does he deny the factual and evidentiary basis for that determination. There is no dispute that the identical issue is now in question, that the previous determination was necessary to the court's decision, and that Breyer was actively represented by counsel. Nevertheless, plaintiff's amended petition alleges that the government in the prior proceeding "intentionally misled the court" by falsely asserting that Breyer had committed fraud and had made material misrepresentations related to his entry and application for naturalization. (Pl.'s Amended Pet. ¶¶ 12–13.) Plaintiff characterizes the prior proceedings that decided this issue as the result of "an uncontested motion for summary judgment." (*Id.* ¶ 14.) Plaintiff further alleges that his former counsel made a unilateral decision to raise no opposition to Counts I and II of the government's complaint or to the government's motion for summary judgment on those counts. (*Id.* ¶¶ 14–15.) He asserts that counsel did so without plaintiff's sanction or authorization, and indeed that it "came as a total shock" to him. (*Id.* ¶ 14.) Accepting these allegations as true for purposes of the motion to dismiss, I will address plaintiff's implication that the

---

**2.** Collateral estoppel, a form of res judicata, may be raised upon a Rule 12(b)(6) motion if the facts are admitted, uncontroverted, or conclusively established so that nothing further can be developed by a trial of the issue. *Lancaster County v. Philadelphia Elec. Co.,* 386 F.Supp. 934, 937 (E.D.Pa.1975) (citing*Williams v. Murdoch,* 330 F.2d 745, 749 (3d Cir.1964); *Hartmann v. Time,* *Inc.,* 166 F.2d 127, 131 n. 3 (3d Cir.1948)); see *Day v. Moscow,* 955 F.2d 807, 811 (2d Cir.1992) (res judicata upheld on 12(b)(6) motion when court noticed its own records showing all relevant facts); *Lambert v. Conrad,* 536 F.2d 1183, 1186 (7th Cir.1976) (res judicata may be raised in Rule 12(b) motion at district court's discretion).

issue was not litigated fully and fairly at that time.

For issue preclusion purposes, an issue of fact or law is "actually litigated" when properly raised on a motion for summary judgment, submitted for determination, and determined. RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. d (1982). In the prior litigation, both in this court and on appeal, Breyer's defense to the government's denaturalization action was his asserted entitlement to derivative citizenship through his mother. *Breyer III*, 41 F.3d at 891; *Breyer I*, 829 F.Supp. at 777. A party's strategic decision not to vigorously litigate an issue does not mean that he had no full and fair opportunity to do so.[3] Even when a party to prior litigation selects a litigation strategy that places "all his eggs in . . . [one] basket," that strategic choice will not prevent the application of issue preclusion. *In re Southeast Banking Corp.*, 69 F.3d 1539, 1553 (11th Cir.1995) (citing JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 0.441[2], at 523 (2d ed.1995)).

This court recognized United States citizenship as a precious right, the loss of which "can have severe and unsettling consequences." *Breyer I*, 829 F.Supp. at 775 (citing *Costello v. United States*, 365 U.S. 265, 269, 81 S.Ct. 534, 536–37, 5 L.Ed.2d 551 (1961)). Accordingly, I undertook a careful and extensive examination of the evidentiary record. *Id.* at 775–77. Among other findings, I determined that Breyer's citizenship "was illegally procured, even if he secured the visa without making misrepresentations." *Id.* at 778–79 & n. 5. It is therefore immaterial whether, as plaintiff presently alleges, the

government's complaint in 1992 was misleading in regard to plaintiff's honesty.

The facts that were dispositive of the government's motion for partial summary judgment were established by the government's substantial uncontroverted evidence, which included Breyer's sworn interview with OSI personnel in November 1991, see *Breyer I*, 829 F.Supp. at 775–77 (citing Gov't Ex. 1.13), and Breyer's amended answers to interrogatories. See *id.* (citing Gov't Ex. 1.21.2). Relevant facts were also admitted in Breyer's amended answer filed in that proceeding.[4] See *id.* (citing Amended Ans. ¶¶ 16, 18, 21, 23–31, 36, 38, 40–41, 44, 46, 49). Among other facts, Breyer admitted that in 1943 he became a member of the *Waffen–SS* and the SS *Totenkopf* (Death's Head) guard unit. *Id.* (citing Amended Ans. ¶ 16). As a member of the SS *Totenkopfsturmbann*, Breyer served as an armed guard of prisoners at both the Buchenwald concentration camp and the Auschwitz death camp. *Id.* (citing Amended Ans. ¶¶ 16, 25).

The Third Circuit, acknowledging the government's heavy burden of proof in a denaturalization proceeding and the importance of the fundamental rights at stake, undertook an "in-depth examination of the record to make certain that the government met its stringent burden." *Breyer III*, 41 F.3d at 889. The court affirmed that the government had met that burden:

> The undisputed facts of record establish that Nazi concentration camps were places where suffering and harm was inflicted upon tens of thousands of innocent persons and that Breyer furthered Nazi military, political and social aims. The record is

---

3. Notwithstanding plaintiff's distress in hindsight, the strategic choices and admissions made by plaintiff's former counsel do not constitute any sort of ineffective assistance of counsel that might conceivably entitle plaintiff to some remedy in the present civil action. See, *e.g., Magallanes–Damian v. I.N.S.*, 783 F.2d 931, 933–34 (9th Cir.1986) (attorney in deportation proceeding permitted to completely forego contesting deportability, in favor of unsuccessful alternate strategy) (citing *Rodriguez–Gonzalez v. I.N.S*, 640 F.2d 1139, 1142 (9th Cir.1981)). "It is not unusual or egregious for counsel to make tactical decisions that ultimately fizzle and redound to the client's detriment." *Leblanc v. I.N.S.*, 715 F.2d 685, 694 (1st Cir.1983).

4. An attorney has the authority to bind his client with admissions in a pleading, such as the admissions in Breyer's amended answer. *Frank v. Bloom*, 634 F.2d 1245, 1251 (10th Cir.1980) (client bound by lawyer's admissions on his behalf, even if later repudiated by client; such admissions are statements by client's agent acting within scope of employment); see also *Missouri Housing Development Comm'n v. Brice*, 919 F.2d 1306, 1314 (8th Cir.1990) (admissions in pleadings binding upon parties unless withdrawn or amended); *O'Neil v. Four States Builders & Remodelers, Inc.*, 484 F.Supp. 18, 20 (E.D.Pa. 1979) (admissions in answer are deemed conclusive).

uncontroverted that he was a trained, paid, uniformed armed Nazi guard who patrolled the perimeters of two such camps with orders to shoot those who tried to escape. The prisoners he guarded and prevented from fleeing were oppressed, brutalized and killed for no other reason than their race, national origin or religion. *Id.* at 890. The Third Circuit held that Breyer's naturalization was properly revoked because "Breyer's service as a member of the SS *Totenkopf* constitutes membership or involvement in a movement hostile to the United States," which precluded his eligibility for a visa under section 13 of the Displaced Persons Act. *Id.* at 890–91. The court further determined that it was "beyond dispute that Breyer assisted in persecution within the meaning of section 13." *Id.* at 890; see also *Fedorenko v. United States*, 449 U.S. 490, 512, 101 S.Ct. 737, 750, 66 L.Ed.2d 686 (1981) (service as concentration camp guard, even if involuntary, constituted assistance in persecution); *United States v. Schmidt*, 923 F.2d 1253, 1259 (7th Cir.1991) (SS *Totenkopf* member serving as armed guard at concentration camp assisted in persecution).

Based upon this court's record and the Third Circuit's exacting review thereof, and accepting plaintiff's present allegations as true for this purpose, I conclude that plaintiff had a full and fair opportunity to litigate Counts I and II of the government's complaint in the prior proceeding. *Breyer II*, 841 F.Supp. 679; *Breyer I*, 829 F.Supp. 773. The government's motion for partial summary judgment in the prior proceeding properly raised and submitted the issue of plaintiff's ineligibility for admission to the United States under section 13 of the DPA, and the factual grounds therefor. See *Breyer III*, 41 F.3d at 887–88; *Breyer I*, 829 F.Supp. at 777. This court carefully considered the extensive evidence before it, and rendered a determination that was thoroughly examined and affirmed upon appeal. *Breyer III*, 41 F.3d at 891, 893. I therefore conclude that Counts I and II of the government's complaint in the prior action were actually litigated, that all of the requirements of issue preclusion are satisfied, and that plaintiff is precluded from relitigating them. *Raytech*, 54 F.3d at 190. Those issues of law and of fact conclusively determined in the prior action are conclusive as to Breyer in this subsequent suit. *Stauffer Chemical*, 464 U.S. at 170–71, 104 S.Ct. at 578; *Montana*, 440 U.S. at 153, 99 S.Ct. 970.

As a result of this determination, plaintiff falls squarely within the category of persons described in § 101(c)(2) of INTCA, which provides in relevant part:

> The retroactive application of the amendment [to 8 U.S.C. § 1401] ... shall not confer citizenship on, or affect the validity of any denaturalization, deportation, or exclusion action against, any person ... who was excluded from, or who would not have been eligible for admission to, the United States under the Displaced Persons Act of 1948....

Pub.L. No. 103–416, § 101(c)(2), 108 Stat. at 4306.

## DISCUSSION

### I. Equal Protection Analysis of INTCA

It is the limitation on retroactivity in § 101(c)(2) of INTCA, plaintiff argues, that makes INTCA unconstitutional because it maintains a portion of the gender discrimination that existed in the law prior to INTCA. The retroactivity limitation allegedly discriminates by denying a benefit to the mothers, but not the fathers, of a rather narrow class of children: those who became terrorists, anarchists, participants in Nazi persecution or other genocide, or who participated in movements hostile to the United States or voluntarily assisted our enemies, and who were born before May 24, 1934, outside the United States, to parents of whom only one was a United States citizen. If the citizen parent were male, his child would be born a United States citizen, because R.S. § 1993 granted such a child citizenship at birth. However, if the citizen parent were female, her child would not be entitled to United States citizenship, because INTCA provides no retroactive grant of citizenship at birth to participants in the conduct to which the statute refers. Plaintiff contends that this distinction constitutes disparate treatment favoring male parents, because only the female parent of such a child is denied the benefit of transmitting her United States citizenship *jure sanguinis*.

The United States Supreme Court recently considered a similar challenge to a provision of the Immigration and Nationality Act in *Miller v. Albright*, 523 U.S. 420, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998). At issue in *Miller* was the constitutionality of 8 U.S.C. § 1409, which contains a gender-based distinction that applies to the parents of illegitimate children born outside the United States when one parent is an alien and the other a United States citizen. Under § 1409(a), an unmarried citizen father must meet various conditions, including formal proof of paternity while the child is under 18, while an unmarried citizen mother is subjected to no such requirements under § 1409(c). *Miller*, 118 S.Ct. at 1435–36.

The Court of Appeals for the District of Columbia Circuit concluded that an illegitimate child born outside the United States of an alien mother and American father could not prevail on an equal protection claim based on the status of the child or the sex of the parent. *Miller v. Christopher*, 96 F.3d 1467 (D.C.Cir.1996), *aff'd sub nom. Miller v. Albright*, 523 U.S. 420, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998). A majority of the Court affirmed on diverse grounds, issuing three opinions concurring in the judgment, each supported by two Justices. The three dissenters joined in two other opinions. In the lead opinion, joined by the Chief Justice, Justice Stevens reasserted the vitality of the Court's century-old summary of the law applying to acquisition of citizenship at birth:

> There are "two sources of citizenship, and two only: birth and naturalization." Within the former category, the Fourteenth Amendment of the Constitution guarantees that every person "born in the United States, and subject to the jurisdiction thereof, becomes at once a citizen of the United States, and needs no naturalization." Persons not born in the United States acquire citizenship by birth only as provided by Acts of Congress.

*Miller*, 118 S.Ct. at 1432 (citations omitted) (quoting *United States v. Wong Kim Ark*, 169 U.S. 649, 702–03, 18 S.Ct. 456, 477–78, 42 L.Ed. 890 (1898)).

## A. Classification on the Basis of Gender

A threshold issue in this case is whether the statutory provision at issue establishes a gender-based classification for the acquisition of citizenship at birth. Section 101 of INTCA amends the INA to add a new subsection 301(h), codified at 8 U.S.C. § 1401(h). The text of this new subsection facially establishes a classification on the basis of gender, in that it confers citizenship at birth, subject to certain exclusions, upon

> a person born before noon (Eastern Standard Time) May 24, 1934, outside the limits and jurisdiction of the United States of an alien father and a mother who is a citizen of the United States who, prior to the birth of such person, had resided in the United States.

Pub.L. No. 103–416, § 101(a)(2), 108 Stat. at 4306, amending 8 U.S.C. § 1401. Regardless of any remedial objectives that might be addressed by the references to "an alien father" and "a mother who is a citizen," there can be no doubt that Congress has, in fact, classified such individuals on the basis of their gender.

## B. Standard of Review for Equal Protection Challenge

Plaintiff expressly raises a challenge based upon his own constitutional rights.[5] Plaintiff's rights are distinguishable from those of his mother. No part of section 101 of INTCA draws a distinction based upon the gender of the child, as opposed to the parent. An injury arising from discrimination "accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct." *Miller*, 118 S.Ct. at 1445 (O'Connor, J., concurring in judgment)

---

**5.** Plaintiff asserts a "violation of his constitutional rights under the 5th and Fourteenth Amendments" (Amended Pet. ¶ 27), but has alleged injury only from federal action, not state action. Plaintiff therefore fails to state a claim under either the Equal Protection Clause or the Due Process Clause of the Fourteenth Amendment. However, Fifth Amendment equal protection

claims are treated "precisely the same as ... equal protection claims under the Fourteenth Amendment." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217, 115 S.Ct. 2097, 2108, 132 L.Ed.2d 158 (1995) (quoting *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975)).

(quoting *Allen v. Wright,* 468 U.S. 737, 755, 104 S.Ct. 3315, 3326, 82 L.Ed.2d 556 (1984)). Because the challenged statute does not distinguish based on the gender of the child, plaintiff cannot claim that he personally has been injured by the gender discrimination at issue here. See *id.* However, section 101(c)(2) of INTCA draws a distinction based upon the post-birth conduct of the child. A legislative classification or distinction that "neither burdens a fundamental right nor targets a suspect class" will be upheld "so long as it bears a rational relation to some legitimate end." *Vacco v. Quill,* 521 U.S. 793, ——, 117 S.Ct. 2293, 2297, 138 L.Ed.2d 834 (1997) (quoting *Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 1627, 134 L.Ed.2d 855 (1996)); see *Pemberthy v. Beyer,* 19 F.3d 857, 871 n. 18 (3d Cir.1994). No federal court has held that a person born outside the United States has a fundamental right to a statutory grant of citizenship.[6] Individuals who have assisted in Nazi persecution "are not a class of persons entitled to enhanced scrutiny under the equal protection clause." See *Linnas v. I.N.S.,* 790 F.2d 1024, 1032 (2d Cir.1986) (denying enhanced scrutiny to "Nazi war criminals"). Accordingly, plaintiff's challenge based upon his own equal protection rights triggers only rational basis scrutiny. *Miller,* 118 S.Ct. at 1445 (O'Connor, J., concurring in judgment); but see 118 S.Ct. at 1457 (Breyer, J., dissenting) (advocating heightened scrutiny and expressing doubt as to significance of whether rights at issue are child's or parent's).

 This case differs from *Miller* in that there is no doubt that plaintiff has third-party standing to assert the equal protection rights of his deceased mother.[7] In that capacity, plaintiff may be entitled to "the heightened scrutiny that normally governs gender discrimination claims applied in this context." *Miller,* 118 S.Ct. at 1437 n. 11 (citation omitted). To withstand an equal protection challenge under heightened scrutiny, where the government engages in gender-based action, it "must show at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia,* 518 U.S. 515, 533, 116 S.Ct. 2264, 2275, 135 L.Ed.2d 735 (1996) (quoting *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982)) (alteration in original) (internal quotation marks omitted). This showing requires an "exceedingly persuasive" justification, which "must be genuine, not hypothesized or invented post hoc in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id.* (citations omitted).

 While heightened scrutiny is ordinarily the appropriate standard of review for an equal protection challenge based on gender discrimination, Congress has traditionally received great deference from the courts

6. See, *e.g., Valmonte v. I.N.S.,* 136 F.3d 914, 918 n. 7 (2d Cir.1998) (citing *Dorr v. United States,* 195 U.S. 138, 146, 24 S.Ct. 808, 812, 49 L.Ed. 128 (1904)); *Rabang v. I.N.S.,* 35 F.3d 1449, 1453 n. 8 (9th Cir.1994). The fundamental rights of citizenship that may not be burdened are rights *inherent* in citizenship, including the right not to be improperly divested of citizenship once legitimately acquired. See *Trop v. Dulles,* 356 U.S. 86, 93, 78 S.Ct. 590, 594, 2 L.Ed.2d 630 (1958).

7. Although plaintiff does not expressly raise his mother's rights in his complaint, I will consider them because they are implicit in his challenge to statutory limitations placed upon the transmission of derivative citizenship. (See Amended Pet. ¶¶ 27–28 & Prayer for Relief.) Plaintiff satisfies the three recognized criteria for third-party standing: (1) the litigant must have "suffered an 'injury in fact'"; (2) the litigant must bear a

"close relationship" to the third party; and (3) there must be "some hindrance" impeding the third party from "asserting [her] own rights." *Campbell v. Louisiana,* 523 U.S. 392, ——, 118 S.Ct. 1419, 1423, 140 L.Ed.2d 551 (1998) (quoting *Powers v. Ohio,* 499 U.S. 400, 411, 111 S.Ct. 1364, 1370–71, 113 L.Ed.2d 411 (1991)). Denial of citizenship is a concrete injury, in which plaintiff's interests and those of his mother "coincide ... and are equally as intense." *Wauchope,* 985 F.2d at 1411. Plaintiff's mother no longer survives to assert her own rights. See, *e.g., Miller,* 118 S.Ct. at 1444 (O'Connor, J., concurring in judgment) (citing *Hodel v. Irving,* 481 U.S. 704, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987)); *Craig v. Boren,* 429 U.S. 190, 193–97, 97 S.Ct. 451, 454–57, 50 L.Ed.2d 397 (1976). In *Miller,* plaintiff's father was living and had chosen not to pursue the litigation, so that plaintiff did not meet the "hindrance" prong.

in the areas of immigration and naturalization. The Supreme Court has acknowledged Congress's plenary authority in those areas, underscoring "the limited scope of judicial inquiry into immigration legislation." *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977). Under the highly deferential standard of *Fiallo v. Bell*, to enact a discriminatory rule regarding immigration or naturalization, Congress need only have a "facially legitimate and bona fide reason." *Id.* at 792–94, 97 S.Ct. at 1477–79.

Section 101 of INTCA operates in a similar fashion to the provision at issue in *Miller*, conferring citizenship at birth upon foreign-born persons who meet statutory requirements that are based in part on the gender of their U.S. citizen parent. Where Congress determines by statute which foreign-born persons are privileged to acquire citizenship at birth, there is some controversy as to whether the deferential standard of review dictated by *Fiallo* and by *Mathews v. Diaz*, 426 U.S. 67, 82, 96 S.Ct. 1883, 1892–93, 48 L.Ed.2d 478 (1976), is applicable. Justice Stevens' lead opinion in *Miller* notes, "Deference to the political branches dictates 'a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization.'" *Id.* 118 S.Ct. at 1437 n. 11 (quoting *Mathews v. Diaz*, 426 U.S. 67, 82, 96 S.Ct. 1883, 1892–93, 48 L.Ed.2d 478 (1976)). I respectfully acknowledge the Court's division as to whether such a provision falls within the area of immigration and naturalization that entitles the statute to a lenient standard of constitutional review.[8] For the reasons that follow, I will adopt the view of Justice Stevens and the Chief Justice, notwithstanding Justice Breyer's thoughtful dissent in *Miller*, 118 S.Ct. at

1437 n. 11; cf. 118 S.Ct. at 1457 (Breyer, J., dissenting).

In *United States v. Wong Kim Ark*, the Court defined the enactment of a statute conferring citizenship upon the foreign-born children of citizens as a form of naturalization:

> A person born out of the jurisdiction of the United States can only become a citizen by being naturalized, either by treaty ... or by authority of congress, exercised either by declaring certain classes of persons to be citizens, *as in the enactments conferring citizenship upon foreign-born children of citizens*, or by enabling foreigners individually to become citizens by proceedings in the judicial tribunals, as in the ordinary provisions of the naturalization acts.

169 U.S. 649, 702–03, 18 S.Ct. 456, 477, 42 L.Ed. 890 (1898) (emphasis added). The Court thereby recognized that a statute conferring citizenship at birth is an exercise of the naturalization power of Congress. *Id.*; accord *Wong Kam Wo v. Dulles*, 236 F.2d 622, 625 (9th Cir.1956) (applying *Wong Kim Ark* to find that R.S. § 1993 is "a naturalization law in the constitutional sense"); *Zimmer v. Acheson*, 191 F.2d 209, 211 (10th Cir.1951) (for German-born child of U.S. citizen father, status acquired under R.S. § 1993 "was that of a naturalized citizen and not a native-born citizen").

The Constitution itself only extends citizenship to "[a]ll persons born or naturalized in the United States and subject to the jurisdiction thereof...." U.S. CONST. amend. XIV. This provision has no application to a person who has not yet acquired citizenship

---

8. Responding to Justice Stevens' statement dictating "a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization," *Miller*, 118 S.Ct. at 1437 n. 11 (quoting *Mathews v. Diaz*, 426 U.S. 67, 82, 96 S.Ct. 1883, 1892–93, 48 L.Ed.2d 478 (1976)), Justice Breyer points out in dissent:

> But that language arises in a case involving aliens. The Court did not say it intended that phrase to include statutes that confer citizenship "at birth." And Congress does not believe that this kind of citizenship involves "naturalization." 8 U.S.C. § 1101(a)(23) ("The term 'naturalization' means the conferring of na-

tionality of a state upon a person *after* birth, by any means whatsoever") (emphasis added). The Court to my knowledge has never said, or held, or reasoned that statutes automatically conferring citizenship "at birth" upon the American child of American parents receive a more lenient standard of review.

· · · · ·

> In sum, the statutes that automatically transfer American citizenship from parent to child "at birth" differ significantly from those that confer citizenship on those who originally owed loyalty to a different nation.

*Id.* at 1459–60 (Breyer, J., dissenting).

by either of the two means specified. *Rogers v. Bellei*, 401 U.S. 815, 827, 91 S.Ct. 1060, 1067, 28 L.Ed.2d 499 (1971). Absent valid naturalization, persons born outside the jurisdiction of the United States are assumed by the Constitution to be aliens, who may "acquire citizenship by birth only as provided by Acts of Congress." *Miller*, 118 S.Ct. at 1432 (quoting *Wong Kim Ark*, 169 U.S. at 703, 18 S.Ct. at 478). The claim of such a person "thus must center in the statutory power of Congress," and "[t]he reach of congressional power in this area is readily apparent." *Rogers*, 401 U.S. at 828, 91 S.Ct. at 1067. Unless and until such a person becomes a citizen under the terms authorized by an act of Congress, that person is an alien, and "[n]o alien has the slightest right to naturalization unless all statutory requirements are complied with." *Fedorenko*, 449 U.S. at 506, 101 S.Ct. at 747 (quotation omitted); *Miller*, 118 S.Ct. at 1437 n. 11 (citing *Rogers*, 401 U.S. at 828–30, 91 S.Ct. at 1067–69).

The Court repeatedly has "emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo*, 430 U.S. at 792, 97 S.Ct. at 1478 (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909)); accord *Kleindienst v. Mandel*, 408 U.S. 753, 766, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972). The Congressional power to exclude aliens has long been recognized by the Court "as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Id.* (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953)). The Court has consistently endorsed the fact that "in the exercise of its broad power over immigration and naturalization, 'Congress regularly makes rules that would be unacceptable if applied to citizens.'" *Reno v. Flores*, 507 U.S. 292, 305–06, 113 S.Ct. 1439, 1449, 123 L.Ed.2d 1 (1993) (quoting *Fiallo*, 430 U.S. at 792, 97 S.Ct. at 1478).

Accordingly, in this case, I will apply the rational basis standard dictated by *Fiallo*, requiring only a "facially legitimate and bona fide reason" for the gender classification at issue in this case. *Fiallo*, 430 U.S. at 794, 97 S.Ct. at 1479. For practical purposes of application, the "facially legitimate and bona fide reason" test has been held to be equivalent to the rational basis test typically applied in equal protection cases. *Ablang v. Reno*, 52 F.3d 801, 804 (9th Cir.1995) (citing *Wauchope*, 985 F.2d at 1414 n. 3); accord *Azizi v. Thornburgh*, 908 F.2d 1130, 1133 n. 2 (2d Cir.1990). A legislative enactment fails the rational basis test if "the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [one] can only conclude that the legislature's actions were irrational." *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979). A legislative classification having some reasonable basis "does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality." *Heller v. Doe by Doe*, 509 U.S. 312, 321, 113 S.Ct. 2637, 2643, 125 L.Ed.2d 257 (1993) (internal quotation marks and citations omitted).

## C. Relation of § 101 of INTCA to Government Objectives

Section 101 of INTCA is titled "Equal Treatment of Women in Conferring Citizenship to Children Born Abroad." Subsection 101(a) clearly advances that purpose and would, if read in isolation, readily pass constitutional muster under either rational basis scrutiny or heightened scrutiny. This subsection amended the INA by creating a provision that confers citizenship at birth upon

> a person born before noon (Eastern Standard Time) May 24, 1934, outside the limits and jurisdiction of the United States of an alien father and a mother who is a citizen of the United States who, prior to the birth of such person, had resided in the United States.

8 U.S.C. § 1401(h). As defendant notes, Congress pointed out the need for such legislation during its consideration of an earlier version of the bill that was to become INTCA:

> The problem is that the 1934 Act was not made retroactive. Thus, persons born abroad before 1934 to a citizen mother and alien father are not citizens of the United States. As Deputy Assistant Secretary of

State John Adams has stated, this provision "clearly discriminates against U.S. citizen mothers with offspring born before 1934." Moreover, it has resulted in "costly litigation, the defense of which, from the standpoint of governmental interests, is unproductive." H.R.REP. No. 103–387 (citing *Wauchope,* 985 F.2d 1407). In referring the final bill to the House, the chairman of the Judiciary Committee noted that "[i]t removes discriminatory barriers which have been in the law for decades and which treated women differently from men for the purposes of transmitting citizenship. There is no basis for such a distinction, and understandably, the State department no longer wishes to defend this distinction." 140 CONG. REC. H9277 (daily ed. Sept. 20, 1994) (statement of Rep. Brooks).

It is undisputed, and beyond dispute, that this remedial purpose is a legitimate and an important governmental objective. It is also undisputed that the gender classification in subsection 101(a) of INTCA, creating 8 U.S.C. § 1401(h), is both rationally and substantially related to that remedial objective, because it extends the right to transmit derivative citizenship to the gender-specific class of persons excluded from that right under prior law.

Subsection 101(a), however, must be read and construed in pari materia with subsection 101(c)(2), which provides, inter alia, that the retroactive application of 8 U.S.C. § 1401(h) shall not confer citizenship on any person who would not have been eligible for admission to the United States under the Displaced Persons Act of 1948. During Congressional proceedings, it was acknowledged that section 101 of INTCA "corrects [the prior law's] inequity, but it does so while expressly prohibiting the conferral of citizenship to anyone who assisted in any form of Nazi persecution." 140 CONG. REC. H9277 (daily ed. Sept. 20, 1994) (statement of Rep. Mazzoli).

Defendant proffers two legitimate governmental objectives for this prohibition under § 101(c)(2) of INTCA: (1) to ensure equal treatment for all foreign-born children of United States citizen parents who have committed expatriating acts; (2) to protect national security and preserve the integrity of citizenship by not extending it to persons who would have been ineligible for admission or naturalization under the DPA, the Refugee Relief Act of 1953, or 8 U.S.C. § 1182(a)(3)(E). The constitutionality of INTCA must be upheld if either of these is a legitimate governmental objective and the classification in § 101(c)(2) is rationally related to it.[9] I will uphold the constitutionality of INTCA on the basis of both of these objectives.

### 1 Similar Treatment of Expatriating Acts

Defendant suggests as a legitimate aim of Congress that § 101(c)(2) "in fact ensures similar treatment for all foreign-born children of United States citizen parents who have committed expatriating acts." (Def.'s Mem. at 20.)

The distinction that remains under § 101 of INTCA between pre–1934 citizen mothers and citizen fathers may be based in part on Congress's awareness that foreign-born children of citizen fathers were entitled to derivative citizenship at the time of their birth, and are likely to have known during World War II that they were United States citizens. See, e.g., *United States v. Schiffer,* 831 F.Supp. 1166, 1190–91 (E.D.Pa.1993), *aff'd,* 31 F.3d 1175 (3d Cir.1994); 139 CONG. REC. S16,863 (daily ed. Nov. 20, 1993) (statement of Sen. Kennedy) (citing *Schiffer*). Because of that knowledge, their wartime conduct could potentially subject them to expatriation. *Schiffer,* 831 F.Supp. at 1190 (citing *Rogers v. Patokoski,* 271 F.2d 858, 861 (9th Cir.1959)). To establish an expatriating act, the government must prove intent to relinquish citizenship, and voluntary participation in Nazi persecution has been held to be inconsistent with the intent to retain United

---

**9.** Plaintiff argues that defendant's position is inconsistent with that taken by the AAU in its opinion of October 15, 1996, and that "[i]t is inexcusable that the Defendant would make contradictory arguments to this court." (Pl.'s Resp. at 11.) However, a defendant is permitted to advance alternative theories and defenses, "regardless of consistency," see, e.g., Fed.R.Civ.P. 8(e), and conclusions of law made by an administrative tribunal are not binding upon this court in reviewing the constitutionality of a statute.

States citizenship. *Id.* at 1183 (SS *Totenkopfsturmbann* member's voluntary service in *Waffen–SS* was expatriating act under Nationality Act of 1940); see *Vance v. Terrazas,* 444 U.S. 252, 100 S.Ct. 540, 62 L.Ed.2d 461 (1980).

The foreign-born children of citizen mothers, however, probably cannot be subjected to expatriation for the same conduct, because *at the time when that conduct was committed* they were not in possession of United States citizenship, and did not know that they might sacrifice a future claim to retroactive United States citizenship. "Obviously Nazis naturalized retroactively could not have known of their U.S. citizenship during the time their crimes were committed." 140 Cong. Rec. H9280 (daily ed. Sept. 20, 1994) (statement of Rep. Schumer).

Section 101(c)(2) of INTCA reflects the attempt of Congress to create gender-neutral consequences for a foreign-born person's assistance in persecution or genocide. There is no dispute that this is a legitimate objective. However, the specific conduct proscribed by § 101(c)(2) of INTCA is not the same as the conduct that may subject a citizen to expatriation, or loss of nationality, under 8 U.S.C. § 1481. That section provides that a citizen loses his nationality by voluntarily performing specified acts with the intention of relinquishing United States citizenship. *Vance v. Terrazas,* 444 U.S. 252, 261, 100 S.Ct. 540, 546, 62 L.Ed.2d 461 (1980). The proscribed acts include any of the following potentially relevant conduct:

(2) taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state or a political subdivision thereof after having attained the age of eighteen years; or

(3) entering, or serving in, the armed forces of a foreign state if

(A) such armed forces are engaged in hostilities against the United States, or

(B) such persons serve as a commissioned or noncommissioned officer; or

(4)(A) accepting, serving in, or performing the duties of any office, post, or employment under the government of a foreign state or a political subdivision thereof after attaining the age of eighteen years, if

he has or acquires the nationality of such foreign state; or

(B) accepting, serving in, or performing the duties of any office, post, or employment under the government of a foreign state or a political subdivision thereof after attaining the age of eighteen years, for which office, post, or employment an oath, affirmation, or declaration of allegiance is required ...

8 U.S.C. § 1481(a). Doubtless, Congress could have more perfectly mirrored the treatment of such conduct by making a direct reference in § 101(c)(2) to the list of expatriating acts in 8 U.S.C. § 1481(a), and by denying the retroactive application of INTCA to persons who had voluntarily committed any of those acts, notwithstanding their intent or lack of intent to relinquish United States nationality. Congress instead chose to base retroactivity upon an entirely different list of proscribed acts in INTCA, focusing specifically on persons who participated in or assisted Nazi persecution or other genocide, as well as terrorists, anarchists, participants in movements hostile to the United States, and persons who voluntarily assisted the enemies of the United States.

Despite this imprecision, I conclude that the classification in § 101(c)(2) of INTCA is rationally related to the stated objective of Congress in attempting to equalize the consequences of expatriating conduct. When a classification "is not made with mathematical nicety or ... in practice ... results in some inequality," such limited inequality does not cause the provision to fail rational basis review. *Heller,* 509 U.S. at 321, 113 S.Ct. at 2643. "When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern." *Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870; see *Vacco v. Quill,* 521 U.S. 793, ——, 117 S.Ct. 2293, 2298, 138 L.Ed.2d 834 (1997).

The people affected by INTCA are not citizens who are expatriated by § 101(c)(2); they are instead aliens who are denied naturalization by § 101(c)(2), and the denial of naturalization burdens no fundamental right of citizenship.[10] Some fraction of the class of

10. See *supra* note 6 and accompanying text.

persons who have committed acts within the scope of § 101(c)(2) may not have committed any of the specific expatriating conduct listed in 8 U.S.C. § 1481(a)(1)-(7). However, "a legislature need not 'strike at all evils at the same time or in the same way.'" *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466, 101 S.Ct. 715, 725, 66 L.Ed.2d 659 (1981) (quoting *Semler v. Oregon State Board of Dental Examiners*, 294 U.S. 608, 610, 55 S.Ct. 570, 571, 79 L.Ed. 1086 (1935)). Although there is not a necessary relationship in all circumstances between expatriating conduct on the one hand, and the conduct specified in § 101(c)(2) of INTCA on the other, there is nevertheless a rational relationship, because Congress could have reasonably believed that there is significant overlap between those individuals targeted by § 101(c)(2) of INTCA and those who have committed the expatriating acts specified in 8 U.S.C. §§ 1481(a)(1)-(7).

### 2. Denial of Naturalization to Inadmissible or Excludable Persons

The second stated purpose of § 101(c)(2) of INTCA is to "appl[y] the exclusion provisions of the Displaced Persons Act (DPA), section 14 of the Refugee Relief Act (RRA), and section 212(a)(3)(E) of the Immigration and Nationality Act (INA), making them a condition of retroactive derivative citizenship." (Def.'s Mem. at 4.)

The application of these exclusionary provisions advances a dual purpose. Congress has acted to exclude from naturalized citizenship people who have committed past acts hostile to the interests of the United States, such as assistance in Nazi persecution, as well as people who represent a present threat to national security, including terrorists and anarchists. Both of these are legitimate governmental objectives, and the classification at issue in this case bears a rational relationship to these objectives.

Plaintiff argues that it is "unimaginable and ludicrous to suppose that a band of veterans, now over 70 years old, could threaten the security of the United States." (Pl.'s Resp. at 16.) There is no evidence that such a supposition is the basis for the legislation. Even assuming that plaintiff and others who assisted in Nazi persecution are not presently hostile to the United States, and represent no present threat to national security, the fact remains that their actions during World War II were inimical to the interests of the United States. See *United States v. Stelmokas*, 100 F.3d 302, 315 (3d Cir.1996) (date of legislative enactment is not significant for determining movement's hostility to United States, as long as "it was such a movement during World War II"). Congress has a legitimate interest "to ensure that the United States is not a haven for individuals who assisted the Nazis in the brutal persecution and murder of millions of people." *Schellong v. INS*, 805 F.2d 655, 662 (7th Cir.1986); see *Linnas*, 790 F.2d at 1030. This interest has a sound foundation in foreign policy and human rights concerns, ensuring that all past, present, and future participants in genocide around the world will be on notice that such conduct is, at the very least, a lifelong bar to naturalized citizenship in the United States. Indeed, "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1950) (upholding expulsion of resident aliens for membership in Communist party).

Furthermore, because "the right to acquire American citizenship is a precious one," see *Fedorenko*, 449 U.S. at 505, 101 S.Ct. at 746, Congress is empowered to "legislate[ ] to safeguard the integrity of this 'priceless treasure.'" *Id.* at 507, 101 S.Ct. at 747 (quotation omitted). In enacting § 101(c)(2) of INTCA, Congress upheld the integrity of United States citizenship by determining that certain conduct that resulted or would have resulted in an alien's excludability or inadmissibility at the border of the United States should also be a bar to that alien's naturalization under INTCA.

Foreign-born children of citizen fathers, having acquired United States citizenship under R.S. § 1993, were naturalized at the moment of their birth. At the time of their naturalization, they were necessarily innocent of any conduct that would render them excludable under the provisions listed in § 101(c)(2) of INTCA. However, the chil-

dren of citizen mothers were not naturalized at the moment of their birth by § 101(a) of INTCA; rather, the naturalization power of Congress was exercised when INTCA became effective. At that time, some of the adults who would otherwise have been naturalized by INTCA had committed conduct for which they were or would have been legitimately excludable at our borders. Congress properly recognized that these people were not similarly situated to the innocent newborns who were naturalized by R.S. § 1993. As a result, Congress did not treat people who are subject to the exclusionary provisions of INTCA equally with the children of United States citizen fathers, who acquired citizenship at birth regardless of their post-birth conduct. Rather, for purposes of acquiring retroactive citizenship at birth under INTCA, their conduct is evaluated on equal terms with aliens seeking to enter the United States or to apply for naturalized citizenship status.

I conclude that section 101 of INTCA does not offend the equal protection component of the Due Process Clause of the Fifth Amendment. Congress acted with a "facially legitimate and bona fide reason," see *Fiallo*, 430 U.S. at 794, 97 S.Ct. 1473, in making the conduct of these individuals a bar to the retroactive grant of citizenship at birth. Section 101 of INTCA makes a logical distinction, based upon both the gender of the citizen parent and the conduct of the foreign-born child, that is rationally related to a legitimate governmental objective.[11]

## II. Due Process Analysis of INTCA

▮ Plaintiff contends that the retroactive application of the exception to INTCA violates due process. Both parties have argued the applicability of *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984). In that case, the Court noted:

> The retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former. But that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose.

*Id.* at 730, 104 S.Ct. at 2718 (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16–17, 96 S.Ct. 2882, 2892–93, 49 L.Ed.2d 752 (1976)); accord *Landgraf v. USI Film Products*, 511 U.S. 244, 266, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994). Where Congress expressly makes a statute retroactive, and prescribes the statute's proper temporal reach, the mere fact that Congress has "ma[d]e its intention clear helps ensure that Congress itself has determined that the benefits of retroactivity outweigh the potential for disruption or unfairness." *Id.* at 268, 114 S.Ct. at 1498.

In section 101(c) of INTCA, Congress made clear that it desired the retroactive application of the amendment creating 8 U.S.C. § 1401(h), subject to certain specific exceptions enumerated in § 101(c)(2). Congress determined that the amendment should

11. If heightened scrutiny were applied to plaintiff's claim of gender discrimination, I would conclude that section 101 of INTCA withstands heightened scrutiny as well. The governmental objectives of national security, foreign policy, and the promotion of human rights are important ones, and there exists a substantial relationship between the differential treatment and the achievement of those objectives. Further, I find the reasons cited to constitute an "exceedingly persuasive justification" for the discriminatory provision. As required of such a justification, it is "not hypothesized or invented post hoc in response to litigation," *Virginia*, 518 U.S. at 533, 116 S.Ct. at 2275; rather, this justification underlies and is reflected in the history of each of the long-standing statutory provisions referenced in § 101(c)(2) of INTCA. See also 139 Cong. Rec. S16,863 (daily ed. Nov. 20, 1993) ("[I]t is our view that we should exercise discretion and caution in remedying discriminatory provisions of current law, and not take any action that would bestow citizenship on individuals who assisted the Nazi regime in its reign of terror") (statement of Sen. Kennedy). Furthermore, unlike the provision regarding unmarried parents discussed by the Court in *Miller*, there is no dispute in this case that Congress did not rely "on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Virginia*, 518 U.S. at 533, 116 S.Ct. at 2275 (citations omitted). Rather, Congress sought to remove the remaining vestiges of impermissible generalizations of that nature, which were embodied in section 1993 of the Revised Statutes, while accommodating the important competing concerns cited herein.

be applied, except as provided in § 101(c)(2), to "persons born before, on, or after the date of the enactment of this Act." For the reasons cited in this opinion's equal protection analysis, *supra,* I conclude that the retroactivity provisions of section 101 of INTCA are justified by a rational legislative purpose, and do not violate due process.

█ Furthermore, in order to implicate the right to due process in this case, a protected interest must be at stake. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than an unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Under the language of the prior statute, plaintiff had no claim of entitlement to derivative citizenship. R.S. § 1993. Under current law, plaintiff has no claim of entitlement to derivative citizenship. INTCA § 101(c)(2). Plaintiff's only possibility of obtaining derivative citizenship was based upon the fleeting and contingent hope that a federal court with jurisdiction over his claim would conclude that either the prior law or the current law was unconstitutional, and would conclude that a grant of citizenship was appropriate equitable relief, and that those conclusions would be upheld if appeal-

ed.[12] In *Breyer I,* 829 F.Supp. at 781, I held that the prior law was unconstitutional, but that holding was vacated because this court lacked jurisdiction. *Breyer III,* 41 F.3d at 892-93. The Third Circuit expressly declined to comment on the effect of INTCA. *Id.* at 887 n. 2. I hold today that the current law as amended by INTCA, including the retroactivity provisions of § 101(c)(2) of INTCA, is constitutional and is applicable to plaintiff. I conclude that plaintiff does not have, and has never had, a protected due process interest in derivative citizenship.

### III. Bill of Attainder

In his opposition to the motion to dismiss, plaintiff contends that § 101(c)(2) of INTCA is an unconstitutional bill of attainder, because he was part of a specific group targeted by that provision. On September 20, 1994, when the House Judiciary Committee referred the bill to the full House, a member of Congress said, "[T]here are several Nazi expatriation cases pending in the United States that would be jeopardized if Nazi children of American mothers were to be naturalized." 140 CONG. REC. H9280 (daily ed. Sept. 20, 1994) (statement of Rep. Schumer). Plaintiff alleges that he was in fact the only person likely to benefit from INTCA who

---

**12.** To the extent that plaintiff's allegations may be interpreted as an attempt to claim that plaintiff was a citizen from the time of his birth, because the law in effect at that time was unconstitutional, such a claim is moot. The enactment of INTCA significantly alters the posture of plaintiff's claim. See, *e.g., U.S. Dep't of Treasury v. Galioto,* 477 U.S. 556, 559-60, 106 S.Ct. 2683, 2685-86, 91 L.Ed.2d 459 (1986).

The Supreme Court has set forth a two-pronged test for mootness: "A case may become moot if (1) the alleged violation has ceased, and there is no reasonable expectation that it will recur, and (2) interim relief or events have 'completely and irrevocably eradicated the effects of the alleged violation.'" *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979). A change in the law demonstrates that the constitutional violations have ceased and will never recur, if the new law satisfies the constitutional principle at issue. See *Finberg v. Sullivan,* 658 F.2d 93, 98 (3d Cir.1980) (en banc). In this case, the alleged constitutional violation has ceased, because Congress acted in the interim to completely and irrevocably eradicate any unconstitutional aspects of R.S. § 1993 as applied to people born

before May 24, 1934. "In view of the statute's amendment ... in such a way as 'effectively to repeal' its prior application, there is no possibility now that the statute's [prior] form will be applied again...." *Bigelow v. Virginia,* 421 U.S. 809, 817-18, 95 S.Ct. 2222, 2230, 44 L.Ed.2d 600 (1975) (discussing amendment of statute mooting question of its overbreadth under First Amendment). I have determined that the limitations placed on the corrective language by Congress do not violate the Constitution. Unfortunately for the plaintiff, those limitations prevent him from obtaining the relief he seeks, but the corrective language was enacted prior to any final judicial declaration of citizenship based upon a finding of unconstitutionality of R.S. § 1993.

Furthermore, if this court were now to rule on the constitutionality of R.S. § 1993, and find it unconstitutional, the anomalous result might be that plaintiff would be granted citizenship without the possibility of expatriation for his past conduct, while a person born to a citizen-father, but otherwise similarly situated to plaintiff, could be subject to expatriation for the same conduct.

was in denaturalization or expatriation proceedings on that date. (Pl.'s Resp. at 9.)

The Bill of Attainder Clause, U.S. CONST. art. I, § 9, cl. 3, is "to be read in light of the evil the Framers had sought to bar: legislative punishment, of any form or severity, of specifically designated persons or groups." *United States v. Brown*, 381 U.S. 437, 447, 85 S.Ct. 1707, 1714, 14 L.Ed.2d 484 (1965). An enactment is a bill of attainder if it satisfies the three prong test set forth in *Selective Service System v. Minnesota Public Interest Research Group*, 468 U.S. 841, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984), by: (1) specifying the affected parties, (2) imposing punishment, and (3) failing to provide the protection of judicial process. *Id.* at 847, 104 S.Ct. at 3352.

Section 101(c)(2) of INTCA specifies the affected parties because it applies to "easily ascertainable members of a group." See *United States v. Lovett*, 328 U.S. 303, 315, 106 Ct.Cl. 856, 66 S.Ct. 1073, 1079, 90 L.Ed. 1252 (1946). The provision targets a specific and narrow subgroup among the foreign-born children of American mothers. Furthermore, assuming plaintiff's allegations to be true for purposes of this motion, Congress or the Department of Justice did intend specifically to target plaintiff by this provision.

However, I conclude that the provision at issue in this case does not inflict forbidden legislative punishment, and therefore cannot offend the Bill of Attainder Clause. The Court has recognized three necessary inquiries in making this determination:

(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes"; and (3) whether the legislative record "evinces a congressional intent to punish."

*Selective Service*, 468 U.S. at 852, 104 S.Ct. at 3355 (quoting *Nixon v. Administrator of General Services*, 433 U.S. 425, 473–78, 97 S.Ct. 2777, 2805–08, 53 L.Ed.2d 867 (1977)). INTCA does not inflict punishment in its historical sense because the enforcement of immigration and naturalization laws, including the denial of naturalized citizenship status to foreign-born persons, has not been found to constitute punishment.[13] INTCA furthers the nonpunitive legislative purposes identified in the equal protection analysis of this court's memorandum accompanying the order granting defendant's motion to dismiss. The legislative record does show that one member of Congress, in discussing "those persons who participated in Nazi activities," stated that "[p]roper prosecution ... depends on the ability to denaturalize and deport them to stand trial overseas for war crimes." 140 CONG. REC. H9280 (statement of Rep. Schumer). This statement may possibly reflect that member's assumption or moral belief that every person who assisted in the inhumanity of Nazi persecution is culpable of a war crime.[14] Nevertheless, the legislative record as a whole does not demon-

---

13. See, *e.g.*, *INS v. Lopez–Mendoza*, 468 U.S. 1032, 1038, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984) (deportation is "purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry"); *Linnas*, 790 F.2d at 1030 (deportation is not punishment, and exclusion from entry "would certainly not fit any historical meaning of punishment"); *Artukovic v. INS*, 693 F.2d 894, 897 (9th Cir.1982); see also S.REP. No. 104–249 (1996) ("Aliens who are required by law or the judgment of our courts to leave the United States are not thereby subjected to a penalty"). A different result might be compelled if INTCA stripped native-born or validly naturalized citizens of their citizenship. See *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 166–70, 83 S.Ct. 554, 566–69, 9 L.Ed.2d 644 (1963) (forfeiture of citizenship and deportation as alien is punishment to native-born United States citizens).

14. This court has no reason to believe that plaintiff has been accused of a war crime, and has not been made aware of any person affected by § 101(c)(2) of INTCA who is presently facing foreign prosecution for war crimes. Commission of a war crime is not a prerequisite to exclusion from the benefits of INTCA based upon section 13 of the DPA. That section "contains no requirement that a defendant personally participate in any hostile acts committed by the movement, and the legislative history suggests that Congress sought to exclude all 'members' of such groups, regardless of the degree of their participation." *United States v. Koreh*, 59 F.3d 431, 444 (3d Cir.1995) (citing *United States v. Osidach*, 513 F.Supp. 51, 73–75 (E.D.Pa.1981)).

strate a punitive intent, but rather an intent to exclude from the benefit of naturalized United States citizenship those who are or would have been legitimately excludable at our borders.

I also conclude that INTCA cannot be a bill of attainder because it does not fail to provide the protection of judicial process. See *Selective Service,* 468 U.S. at 847, 104 S.Ct. at 3352. A person to whom § 101(c)(2) applies is in no way denied the opportunity to pursue appropriate judicial remedies challenging the application of that provision to the facts of his or her case.

### IV. Motion to Amend

Plaintiff makes a number of additional arguments in opposition to the motion to dismiss, based upon claims and allegations that were not pleaded in his Amended Petition, however liberally construed. These include allegations of intentional delay in the administrative adjudication of plaintiff's application, and various civil rights claims against defendant and proposed additional defendants. Because these claims are the subject of plaintiff's motion to amend his petition, they will be considered in the context of that pending motion.

### CONCLUSION

The naturalization of aliens is an area of law in which plenary authority resides in the Congress, and in which its will is nearly paramount. In legislative enactments spanning half a century, including the Displaced Persons Act of 1948 and the Immigration and Nationality Technical Corrections Act of 1994, Congress has consistently made clear its judgment that those who assisted in persecution under the Nazi regime are not welcome to share in the benefits of United States citizenship. The rationality of that Congressional decision, on its face and as applied, is unassailable. The persecution undertaken by the Nazis was one of the most deplorable episodes of brutality and inhumanity in the history of mankind. It was properly within the power of Congress to decide, as it did, that the United States shall forever deny refuge and naturalization to those who played any part, however small, in assisting Nazi persecution.

Plaintiff has already been found deportable by an immigration judge in deportation proceedings. This court is not unmindful of the severe consequences of "the doom of deportation ... in the case of those whose lives have been intimately tied to this country," such as plaintiff. *United States ex rel. Eichenlaub v. Shaughnessy,* 338 U.S. 521, 533, 70 S.Ct. 329, 335, 64 L.Ed. 307 (1950) (Frankfurter, J., dissenting); see *Ng Fung Ho v. White,* 259 U.S. 276, 284, 42 S.Ct. 492, 495, 66 L.Ed. 938 (1922) (deportation may result in loss of "all that makes life worth living"). Nevertheless, because of the law in effect at the time of his birth, Johann Breyer was an alien when he entered the United States. Because of his conduct, he has subjected himself to the judgment of Congress in its exercise of the naturalization power, and he therefore remains an alien today.

Section 101 of the Immigration and Nationality Technical Corrections Act of 1994 does not violate equal protection or due process under the Fifth Amendment, and is not a bill of attainder. Defendant's motion to dismiss will therefore be granted. An appropriate order follows.

### *ORDER*

AND NOW, this day of August, 1998, upon consideration of defendant's motion to dismiss and the responses and supplemental briefs submitted by the parties, IT IS HEREBY ORDERED that defendant's motion to dismiss is GRANTED and plaintiff's amended petition for declaratory relief is DISMISSED.