**UNITED STATES of America**

v.

**Johann BREYER.**

**Civ. A. No. 92–2319.**

United States District Court,
E.D. Pennsylvania.

July 6, 1993.

Debra Leanne Wrobel Cohn, U.S. Atty.'s Office, Philadelphia, PA, Denise Noonan Slavin, Criminal Div., Michael D. Bergman, U.S. Dept. of Justice, Office of Special Investigations, Washington, DC, for U.S.

John Rogers Carroll, Carroll & Carroll, Joseph V. Restifo, Philadelphia, PA, for defendant.

## MEMORANDUM AND ORDER

YOHN, District Judge.

Presently before the court is a denaturalization action filed by the United States government pursuant to Section 340(a) of the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. § 1451(a). The government seeks to revoke and set aside a 1957 order issued in this district admitting the defendant, Johann Breyer, as a United States citizen. The government also seeks to cancel defendant's certificate of naturalization (number 7992538) which was issued pursuant to that order. This court has jurisdiction pursuant to 28 U.S.C. § 1345 and 8 U.S.C. §§ 1421(a), 1451(a).

In its five count complaint, the government alleges that defendant was a member of a SS *Totenkopf* (Death's Head) Battalion as an armed guard of prisoners during World War II. Defendant occupied this position at the Buchenwald concentration camp in Germany and later at Auschwitz death camp in Nazi-occupied Poland. The government asserts that defendant misrepresented and concealed his Nazi guard service when applying for a visa to enter the United States under the Displaced Persons Act of 1948, Pub.L. No. 80–774, 62 Stat. 1009, *amended by*, Pub.L. No. 81–555, 64 Stat. 219 (1950) ("DPA") and when applying for naturalization.

The government now moves for summary judgment on counts I and II. Count I alleg-

es that defendant's entry into the United States was unlawful under the DPA in that he illegally procured his citizenship because he advocated or assisted in the persecution of people because of race, religion, or national origin. Count II alleges that defendant's entry into the United States was unlawful because his membership and participation in a movement which was hostile to the United States or the form of government of the United States made the procurement of his citizenship illegal. In response to the government's motion, the defendant contends that his mother was born in the United States and thus he is a United States citizen by birth. For the reasons explained in this memorandum and order, the court will grant the government partial summary judgment on counts I and II, without prejudice to defendant's right to pursue the issue of citizenship by birth.

### *Summary Judgment Standard*

The United States Supreme Court recognizes United States citizenship as a precious right once it is acquired. The loss of United States citizenship can have severe and unsettling consequences. *Costello v. United States,* 365 U.S. 265, 269, 81 S.Ct. 534, 536–37, 5 L.Ed.2d 551 (1961). In a denaturalization action, the government bears a heavy burden of proof. "The evidence justifying revocation of citizenship must be 'clear, unequivocal and convincing' and not leave 'the issue in doubt.'" *Fedorenko v. United States,* 449 U.S. 490, 505–06, 101 S.Ct. 737, 747, 66 L.Ed.2d 686 (1981). However, there must also be strict compliance with any congressionally imposed prerequisites to the acquisition of citizenship. *Id.* at 506, 101 S.Ct. at 747. Failure to comply with any of the conditions set by Congress can result in citizenship being set aside. *Id.*

Even with the heavy burden of proof placed upon the government in naturalization cases, summary judgment remains applicable in such actions. *United States v. Dercacz,* 530 F.Supp. 1348, 1349 n. 1 (E.D.N.Y.1982); 6–Part 2 Moore's Federal Practice ¶ 56.-17[76] at 56–668 (2d ed. 1993). Summary judgment is appropriate if there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Small v. Seldows Stationery,* 617 F.2d 992, 994 (3d Cir.1980). The moving party need not produce evidence to disprove the opponent's claim but does carry the burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In turn, the nonmoving party must offer specific facts contradicting the facts averred by the movant which indicate there is no genuine issue for trial. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 883, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990). If there are no genuine issues as to material facts, the court must determine whether the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c).

### FACTUAL BACKGROUND NOT IN DISPUTE

Defendant's parents were married on November 17, 1913. Government Exhibit 1.18 at 2. Defendant's father was born in Nova Lesna at the time it was part of Austria–Hungary.[1] *Id.* Defendant was born on May 30, 1925 in Neuwalddorf, now known as Nova Lesna, in the Federal Republic of Czech and Slovak. Between 1925 and 1943, defendant resided in Neuwalddorf with his parents. Amended Ans. ¶ 8.

Beginning in or about February, 1943, defendant became a member of the *Waffen SS* and was part of the SS *Totenkopf* guard unit. Amended Ans. ¶ 16. Defendant was assigned to the Buchenwald concentration camp from February, 1943 to May, 1944, as an armed guard of prisoners. Amended Ans. ¶ 18, Government Exhibit 1.21.2 ¶¶ 3–4. As a member of the Buchenwald *Totenkopf,* defendant wore a dark green uniform with a skull and crossbones on the lapel. Exhibit 1.13 at 87–88; Exhibit 1.21.2 at ¶ 4. When defendant arrived at Buchenwald, he received training on how to handle a rifle and deal with prisoners. Exhibit 1.13 at 97–99; Exhibit 1.21.2 at ¶ 4. One of defendant's duties at Buchenwald involved standing

---

1. The parties dispute the birthplace of defendant's mother.

guard outside the perimeter of the camp with a loaded rifle. While on guard duty, defendant had instructions to shoot any prisoner trying to escape that failed to heed a warning to stop. Exhibit 1.13 at 108–110, 116–17, 127–28. Defendant also escorted work prisoners to and from their respective work sites. Amended Ans. ¶ 24. Defendant was paid for his service at Buchenwald and he also received one two-week paid leave per year. Exhibit 1.13 at 111–13; Exhibit 1.21.2 at ¶ 4. Defendant admits that he observed that prisoners wore badges on their uniforms as a means of identifying the basis for their imprisonment. Amended Ans. ¶ 21. Defendant now believes that prisoners at the Buchenwald camp were subjected to abuse, torture and killing. Amended Ans. ¶ 23. However, defendant denies ever participating in any of this conduct while a guard at Buchenwald.

Defendant was transferred to the Auschwitz death camp in May, 1944. Auschwitz was the infamous death camp complex established by Nazi Germany in Nazi occupied Poland. He remained on duty there as a part of the *Totenkopf* guard battalion until August, 1944. Amended Ans. ¶ 25; Exhibit 1.21.2 at ¶ 4. At Auschwitz, defendant continued wearing the *Totenkopf* uniform. He also continued carrying a rifle while he guarded the camp's perimeter and escorted prisoners to their work sites. Amended Ans. 25–30. While at Auschwitz, defendant received a promotion to private first class, with an increase in pay. Exhibit 1.21.2 at ¶ 4. Defendant admits that he observed that prisoners who were not killed at Auschwitz wore badges indicating the reason for their imprisonment. Amended Ans. ¶ 29. During his service at Auschwitz, defendant admits that prisoners were killed, tortured or experimented on because of their religion, national origin or political beliefs. Amended Ans. ¶¶ 27–28. Defendant believed that Auschwitz was worse than the Buchenwald camp. He admitted that he saw smoke rising from the crematoria that he knew was from burning bodies. Exhibit 1.13 at 123, 129, 164, 168–69, 234. Defendant denies taking part personally in any of this conduct. Defendant

took one of his paid two-week leaves in August, 1944. During this leave he returned home. Defendant never returned to guard duty from this leave. Exhibit 1.21.2 at ¶¶ 4–5; Exhibit 1.13 at 50–53, 151, 177–81.

In May, 1951, defendant made an application to the United States Displaced Person Commission ("DPC") to determine whether he was a Displaced Person as defined in the DPA, and thus eligible to immigrate to the United States. Amended Ans. ¶ 31; Exhibit 1.13 at 70–71. Defendant's application was initially rejected because of his military service in the *Waffen–SS*. In or about September, 1951, the criteria for eligibility changed so that being a member of the *Waffen–SS* no longer made a person ineligible for Displaced Person status. Exhibit 1.19 and 1.20. However, being a *Totenkopf* guard was still a bar to achieving the status of Displaced Person. *Id.* Subsequently, the DPC interviewed the defendant. Defendant admitted that he was a member of the *Waffen–SS*. Amended Ans. ¶ 36. Defendant now admits that he never informed the DPC of his membership in the *Totenkopf*.[2] Amended Ans. ¶ 38. The DPC certified defendant as a Displaced Person on March 28, 1952.

On or about March 24, 1952, defendant filed an "Application for Immigrant Visa and Alien Registration" with the American Vice Consul in Munich, Germany. This application claimed eligibility under the DPA. Amended Ans. ¶¶ 40–41; Exhibit 1.13 at 191–93. Defendant's application for a immigrant visa was approved on April 2, 1952. On May 13, 1952, defendant, using his immigrant visa, entered the United States. Amended Ans. ¶ 44.

On or about July 17, 1957, defendant filed an "Application to File Petition for Naturalization" and a "Statement of Facts for Preparation of Petition" with the Immigration and Nationalization Service ("INS"). Amended Ans. ¶ 46. Defendant filed his petition for naturalization (Form N–405) on or about August 19, 1957. Amended Ans. ¶ 49. The United States District Court for the Eastern District of Pennsylvania granted defendant's

---

**2.** While defendant admits he never divulged this information to the DPC, he also alleges that he

was never asked about any aspect of his military service. Amended Ans. ¶ 38.

petition and issued him Certificate of Naturalization No. 7992538.

## DISCUSSION

The government moves for summary judgment on count I of its complaint, illegal procurement of United States citizenship due to wrongful admission of the defendant under the DPA because of his assistance in persecution, and count II, illegal procurement of United States citizenship due to wrongful admission of defendant under the DPA because of his participation in a movement hostile to the United States. Defendant, in response to the government's motion, presents the sole defense that his mother was born in the United States and thus he was a citizen by birth. Defendant contends he only discusses this issue and not other applicable defenses since he believes that citizenship by birth is the threshold issue which must be resolved first. Since the government's motion and the defendant's sole defense involve two distinct issues, naturalization and citizenship by birth, the court will first address the merits of the government's motion. The court will then examine the citizenship by birth issue.

I. *Count I—Illegal Procurement of United States Citizenship: Unlawful Admission Under the DPA (Assistance in Persecution)*

■ If citizenship was illegally procured, a person's certificate of naturalization must be revoked. 8 U.S.C. § 1451; *Polites v. United States,* 364 U.S. 426, 436–37, 81 S.Ct. 202, 208–09, 5 L.Ed.2d 173 (1960). Congress has imposed certain terms and conditions for securing valid citizenship. Citizenship is illegally procured "if some statutory requirement which is a condition precedent to naturalization is absent at the time the petition for naturalization is granted." *United States v. Demjanjuk,* 518 F.Supp. 1362, 1380 (N.D.Ohio 1981), *aff'd,* 680 F.2d 32 (6th Cir.), *cert. denied,* 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982). Lawful admission by an immigrant into the United States in order to become naturalized requires the immigrant to have a valid immigrant visa at time of entry. *See Fedorenko v. United States,* 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981); 8 U.S.C. § 1427(a)(1). Pursuant to Section 13 of the DPA, "[n]o visas shall be issued under the provisions of this Act, as amended, to any person who ... advocated or assisted in the persecution of any person because of race, religion or national origin." 64 Stat. 227.

The government argues that defendant was not eligible for the United States immigrant visa he received because he was a member of the SS *Totenkopf* who "assisted in persecution as an armed guard at Buchenwald concentration camp and Auschwitz death camp." Government's Motion for Summary Judgment at 24. Because defendant was ineligible for a visa, the government asserts that defendant's entry into the United States was unlawful. Since defendant's entry into the United States was unlawful, the grant of citizenship would be illegally procured.

The DPC has consistently found that Nazi camp guards who participated in persecutions of inmates because of race, religion or national origin were ineligible for an immigrant visa under Section 13 of the DPA by rejecting their visa applications. Government Exhibits 3.61–3.64. Courts, when faced with the issue of Nazi camp guards, who assisted in persecutions, have also ruled that Nazi camp guards were ineligible for visas to enter the United States under the DPA. *See Fedorenko,* 449 U.S. at 513, 101 S.Ct. at 750; *Demjanjuk,* 518 F.Supp. at 1382 n. 43; *United States v. Kairys,* 600 F.Supp. 1254 (N.D.Ill.1984); *United States v. Osidach,* 513 F.Supp. 51 (E.D.Pa.1981).[3]

Since Nazi guards are ineligible for entry visas, the court must determine if defendant was a participant, per Section 13 of the DPA,

---

3. *Fedorenko* was not decided under Section 13 of the DPA but rather found the defendant ineligible for an entry visa under a provision of the International Refugee Organization ("IRO") Constitution that was incorporated by reference into Section 2 of the DPA. That provision denied visas to persons who assisted the enemy in persecuting civilian populations just like the amended version of Section 13. Courts, when considering Section 13 claims, have used the *Fedorenko* analysis to interpret Section 13 since the language is virtually identical and thus indistinguishable in meaning. *See Demjanjuk,* 518 F.Supp. at 1381–82; *Osidach, supra.*

in persecutions because of race, religion or national origin. The standard for participation was set forth by the United States Supreme Court in *Fedorenko*. In *Fedorenko*, the factors upon which the Supreme Court relied in finding that the defendant had been a participant in committing acts of persecution against concentration camp inmates were:

> The solution to the problem perceived by the District Court lies not in "interpreting" the Act to include a voluntariness requirement that the statute itself does not impose, but in focusing on whether particular conduct can be considered assisting in the persecution of civilians. Thus, an individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp, fits within the statutory language about persons who assisted in the persecution of civilians. Other cases may present more difficult line drawing problems, but we need only decide this case. *Fedorenko*, 449 U.S. at 512 n. 34, 101 S.Ct. at 750. n. 34.

Other courts deciding denaturalization cases regarding armed camp guard service have held that guard service, even perimeter service as defendant asserts he was limited to, qualified as assistance in persecution. *See United States v. Schmidt*, 923 F.2d 1253 (7th Cir.1991); *Schellong v. United States Immigration & Naturalization Service*, 805 F.2d 655 (7th Cir.1986); *United States v. Linnas*, 685 F.2d 427 (2d Cir.1982); *Osidach, supra.*

 In this instance, defendant admits he was an armed guard at Buchenwald con-

centration camp and the Auschwitz death camp. Defendant admits, and history confirms, that activities which occurred at these camps were brutal and included such acts upon the inmates of the camps as murder, torture, confinement, forced labor and experimentation. While at these camps, defendant wore a uniform, carried a rifle with ammunition, was paid a stipend, was allowed to leave camp and had orders to shoot prisoners attempting to escape. The court does not believe any difficult line drawing is necessary. Thus, the court finds there is no genuine issue of material fact and as a matter of law the defendant assisted in persecution proscribed by Section 13 of the DPA.

Defendant acknowledges that case law recognizes that involuntary camp guard service such as defendant's service "does amount to assistance or participation in the prosecution of civilian populations." Defendant's Memorandum Opposing Plaintiff's Motion at 1. However, defendant urges that these cases are no longer valid and that the Supreme Court would now require that defendant's actions at the Nazi camps have been voluntary in order to constitute assistance in persecution. Defendant presents no evidence or case law suggesting that the Supreme Court would rule as defendant predicts. In fact, *Fedorenko* explicitly found that voluntariness was not a factor in determining whether a guard "assisted in persecution." 449 U.S. at 512–13, 101 S.Ct. at 750.[4] Thus, the court must refuse, as did the *Fedorenko* court, to "imply a condition which is opposed to the explicit terms of the statute and find that defendant's actions had to be voluntary." *Id.* at 513, 101 S.Ct. at 750.

Since the court has found that defendant assisted in persecution within the meaning of Section 13 of the DPA, as a matter of law his entry visa into the United States was invalid. Since defendant's visa was invalid, he was not lawfully admitted for permanent residence in the United States. Hence, the court finds

---

4. The *Fedorenko* court found that the inclusion of the voluntariness requirement in the language of certain exclusionary provisions, but its exclusion from the persecution provisions. In order to be consistent with *Fedorenko*, the court concludes that in Section 13 of the amended DPA, Congress included a voluntariness requirement in a provi-

sion regarding the bearing of arms against the United States, but excluded the requirement from the persecution provision. *See United States v. Leprich*, 666 F.Supp. 967, 969 (E.D.Mich.1987); *Osidach*, 513 F.Supp. at 73 n. 9.

that defendant's citizenship was illegally procured, even if he secured the visa without making misrepresentations.[5] Therefore, the court will grant the government partial summary judgment as to count I of the complaint.

II. *Count II—Illegal Procurement of U.S. Citizenship: Unlawful Admission Under the DPA (Membership in Hostile Movement)*

■ Section 13 of the DPA declared, in pertinent part, that:

No visas shall be issued under the provisions of this Act, as amended, to any person who ... is or has been a member of or participated in any movement which is or has been hostile to the United States or the form of government of the United States. 64 Stat. 227.

The government argues that defendant's service as a member of the SS *Totenkopf* constituted such participation in a movement hostile in the United States. Because of this participation, the government asserts that defendant's visa was invalid. Without a valid visa, defendant would fail to satisfy all the statutory requirements for naturalization. *See Demjanjuk, supra.* Thus, the government asserts that defendant's citizenship was illegally procured. *See* Section 316 of the Immigration and Nationality Act, 8 U.S.C. §§ 1427(a)(1) and 1429.

Very few denaturalization cases have been decided on the grounds of an invalid visa under the DPA because of membership in a hostile movement. One such case that decided this issue was *United States v. Koziy*, 540 F.Supp. 25, 34 (S.D.Fla.1982), *aff'd* 728 F.2d 1314 (11th Cir.), *cert. denied*, 469 U.S. 835, 105 S.Ct. 130, 83 L.Ed.2d 70 (1984). That court, relying on a list of organizations whose members the DPC determined were ineligible for Displaced Person status, found that defendant's membership in the Ukrainian police and Organization of Ukrainian Nationalists qualified as participating in movements hostile to the United States. Since the defendant in that case was a participant in a

hostile movement, the court determined his visa was invalid and thus his citizenship had to be revoked. *See also, United States v. Sokolov*, 814 F.2d 864 (2d Cir.1987) (defendant's authorship of articles that were pro-Nazi was participation in a hostile movement and thus he was ineligible for a visa under Section 13 of the DPA).

In this instance, defendant admits he was a member of the SS *Totenkopf*. The government has produced documentation that the DPC considered such a group to be a political unit hostile to the United States. *See* Government Exhibit 1.19, *Circular Memorandum No. Y–123 to DP Visa Sub–Offices in Germany, Austria, and Italy*, from the American Consulate General, Frankfurt, dated September 4, 1951 and Exhibit 1.20, *Interoffice Memorandum U.S. Displaced Persons Commission Headquarters Frankfurt Instruction Memo No. 242*, dated November 12, 1951. Defendant only offers a general denial that such an organization constituted a hostile movement. A general denial in a motion for summary judgment is insufficient to create an genuine issue of fact or question of law. Thus, the court finds that there is no genuine issue of material fact that defendant was a member of the SS *Totenkopf* and that such membership in the SS *Totenkopf* makes the defendant a participant in a movement hostile to the United States. As a matter of law, Section 13 of the DPA precluded the defendant from receiving a valid entry visa because of this membership. Without a valid entry visa, defendant's citizenship was illegally procured. Therefore, the court will grant the government partial summary judgment as to count II of its complaint.

III. *Citizenship by Birth*

■ Neither party disputes that defendant was born outside the United States on May 30, 1925 in Neuwalddorf, now known as Nova Lesna, in the Federal Republic of Czech and Slovak. However, a dispute does arise over defendant's claim that his mother was born in in the United States.[6] Because of this claim,

---

**5.** Illegal procurement of a visa can be established without proof of misrepresentation. *See Leprich*, 666 F.Supp. at 969; *United States v. Kairys*, 600 F.Supp. 1254 (N.D.Ill.), *aff'd*, 782 F.2d 1374 (7th Cir.1986).

**6.** The defendant offers attachments to his motion to support his claim that his mother was born in the United States. This same evidence was offered to the Immigration and Nationalization Service which found that this evidence was insuf-

defendant asserts that he was a United States citizen by birth.

When defendant was born, Section 1993 of the Revised Statute of 1874 awarded United States citizenship to foreign-born offspring of United States citizen fathers but not to United States citizen mothers.[7] Section 1993 was amended in 1934 to make it gender neutral in that any child born thereafter outside of the United States to either a United States citizen father or mother was considered a United States citizen so long as the child fulfilled certain residency requirements. Act of May 24, 1934, ch. 344, § 1, 48 Stat. 797. Section 1993 has since been repealed and replaced with superseding statutory provisions, including Section 301(a) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1401. These replacement statutes grant citizenship to all foreign-born children of either American citizen parent in a more liberal fashion. Neither the 1934 amendment to Section 1993 nor 8 U.S.C. § 1401 is to be applied retroactively. *See Montana v. Kennedy*, 366 U.S. 308, 312, 81 S.Ct. 1336, 1339, 6 L.Ed.2d 313 (1961); *Rogers v. Bellei*, 401 U.S. 815, 91 S.Ct. 1060, 28 L.Ed.2d 499 (1971).

Defendant wants this court to declare that Section 1993, as it existed when he was born, was unconstitutional. The reason defendant claims that it was unconstitutional is that it did not afford his mother, who, he asserts, was born in the United States, the same rights as an American-born father. Section 1993 allowed American-born men, but not American-born women, the right to give their children born in foreign countries United States citizenship. Defendant challenges the constitutionality of this statute as being a violation of the equal protection of laws based upon the Fifth Amendment to the United States Constitution.

Ordinarily, a court examining the constitutionality of a statute drawn along gender lines would apply an intermediate level of scrutiny. This type of scrutiny requires that a statute be substantially related to an important governmental interest. *Kirchberg v. Feenstra*, 450 U.S. 455, 101 S.Ct. 1195, 67 L.Ed.2d 428 (1981). However, this standard does not apply to naturalization and immigration statutes which differentiate according to gender. As the Supreme Court stated in *Mathews v. Diaz*, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), "[i]n the exercise of its broad power over nationalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." 426 U.S. at 79–80, 96 S.Ct. at 1891. The Supreme Court in *Fiallo v. Bell*, 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) has ruled that the test for determining the constitutionality of an immigration and nationalization statute is whether the classification is based upon a facially legitimate and bona fide reason. Thus, the court will examine the constitutionality of Section 1993 under the *Fiallo* standard.

Since the Supreme Court has never ruled on the constitutionality of Section 1993, this court has looked to guidance from the circuit courts. However, circuit courts have not been frequently called upon to decide the constitutionality of Section 1993. It appears that only two circuit court cases have ruled on the constitutionality of Section 1993 as it applied to defendant on the date of his birth. One court found that Section 1993 was constitutional. *Villanueva–Jurado v. Immigration and Naturalization Service*, 482 F.2d 886 (5th Cir.1973). However, in a more recent decision, a court found that Section 1993 was unconstitutional. *Wauchope v. United States Dept. of State*, 985 F.2d 1407 (9th Cir.1993).

In *Villanueva*, the Fifth Circuit rejected the petitioner's claim that Section 1993's failure to provide foreign-born offspring of American citizen mothers with citizenship was "invidious discrimination forbidden by

---

ficient to establish that his mother was born in the United States. The court notes, and the government agrees, that this decision is not binding on this court.

7. The statute read:

All children heretofore born out of the limits and jurisdiction of the United States, whose fathers were or may be at the time of their birth citizens thereof, are declared to be citizens of the United States; but the rights of citizenship shall not descend to children whose fathers never resided in the United States.

Revised Statutes of 1874, § 1993.

the Constitution." 482 F.2d at 887. The Fifth Circuit relied on its previous holding that Congress has a free hand in defining the citizenship of children born abroad. *Id., citing, United States v. Trevino Garcia,* 440 F.2d 368 (5th Cir.1971). Moreover, the *Villanueva* court drew guidance from the Supreme Court statement in *Rogers v. Bellei,* 401 U.S. 815, 91 S.Ct. 1060, 28 L.Ed.2d 499 (1971) that:

> Not until 1934 would [a person born abroad of an American mother and alien father] have had any conceivable claim to United States citizenship. For more than a century and a half no statute was of assistance. Maternal citizenship afforded no benefit. One may observe, too, that if [such a person] had been born in 1933, instead of in 1939 [as was Bellei], he would have no claim even today. 401 U.S. at 826, 91 S.Ct. at 1066.[8]

Therefore, since the *Villanueva* court found that *Bellei* imposed no restrictions on Congress' power to determine eligibility for citizenship, the Fifth Circuit held Section 1993 to be constitutional.

In the more recent *Wauchope* case, the Ninth Circuit took a position contrary to that of the Fifth Circuit and held that the pre–1934 Section 1993 was unconstitutional. In *Wauchope,* the government stated the reason for Section 1993's gender distinction was to avoid problems associated with dual citizenship. The government contended that much of the world regarded the children of mixed marriages as obtaining the citizenship of the father while only thirteen (13) countries passed its citizenship to a child born in a foreign country regardless of which parent was a citizen of that country. As in this case, the government in *Wauchope* could not produce references from the text or the legislative history of the statute to support its position. While the *Wauchope* court did not find the lack of references to purpose fatal, it stated that "courts need not in equal protection cases accept at face value assertions of legislative purposes when ... the asserted purpose could not have been a goal of the legislation." 985 F.2d at 1415, *quoting, Weinberger v. Wiesenfeld,* 420 U.S. 636, 648

n. 16, 95 S.Ct. 1225, 1233 n. 16, 43 L.Ed.2d 514 (1975). The *Wauchope* court found that Congress had an appropriate concern with dual citizenship. However, because other countries' gender neutral laws on citizenship granted a significant number of children born abroad to American citizen fathers its citizenship, the court found that avoiding dual nationality problems was not a legitimate basis for Section 1993's gender distinction for transmitting citizenship to foreign-born children. Therefore, since the government failed to set forth a facially legitimate and bona fide reason to justify the statute's unequal treatment of United States citizen men and women, the *Wauchope* court found the statute unconstitutional.

In this instance, as in *Wauchope,* the government offers the problems of dual citizenship as the reason for Section 1993's gender distinctions. The court has reviewed the decisions in *Villanueva* and *Wauchope* and finds the *Wauchope* decision to be more persuasive in the context of the law today. Like *Wauchope,* this court finds that the government's stated purpose for Section 1993's gender distinction does not constitute a facially legitimate and bona fide reason to justify the different treatment that was afforded United States citizen men and women. Therefore, the court finds Section 1993, as it is to be applied to defendant, unconstitutional.

Just because this court has found Section 1993, as it would be applied to the defendant, unconstitutional, it does not automatically follow that the appropriate remedy for a constitutional violation is the grant of United States citizenship. This court will defer ruling on what remedy should be awarded until after the trial on the issue of defendant's citizenship through his mother. If after resolving all the factual issues the court determines that defendant's mother was born in the United States, the court will request that the parties fully brief what remedy should be afforded to the defendant.

An appropriate order follows.

### ORDER

**AND NOW,** this 2nd day of July, 1993, upon consideration of the United States of

---

8. It should be noted that the *Bellei* court did not decide on Section 1993's constitutionality.

America's motion for summary judgment on counts I and II of its complaint, and the defendant's response thereto, **IT IS HEREBY ORDERED THAT** the United States of America **IS GRANTED PARTIAL SUMMARY JUDGMENT** as to counts I and II of its complaint, **WITHOUT PREJUDICE** to defendant's right to pursue the issue of United States citizenship by birth as an affirmative defense.