

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-20-2003

# Breyer v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 02-4226

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Breyer v. Atty Gen USA" (2003). *2003 Decisions.* Paper 75.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/75

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed November 19, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-4226

JOHANN BREYER

v.

*JOHN ASHCROFT,
U.S. IMMIGRATION AND NATURALIZATION SERVICE,

Appellant

*(Pursuant to F.R.A.P. 43(c))

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 97-cv-06515
(Honorable William H. Yohn, Jr.)

Argued July 29, 2003

Before: SCIRICA, *Chief Judge*, RENDELL and AMBRO,
*Circuit Judges*

(Filed November 19, 2003)

JONATHAN C. DRIMMER, ESQUIRE
 (ARGUED)
DAVID W. FOLTS, ESQUIRE
Office of Special Investigations
United States Department of Justice
Criminal Division
10th & Constitution Avenue, N.W.
Keeney Building, Suite 200
Washington, D.C. 20530

Attorneys for Appellant

MARTIN R. LENTZ, ESQUIRE
 (ARGUED)
Pelino & Lentz
One Liberty Place, 32nd Floor
1650 Market Street
Philadelphia, Pennsylvania 19103

Attorney for Appellee

## OPINION OF THE COURT

SCIRICA, *Chief Judge.*

The government seeks to strip Johann Breyer of his United States citizenship for serving in the *Waffen SS* during World War II. At issue is whether Breyer, who joined at age seventeen, was a voluntary member of the Nazi military unit. The District Court found that he was not, and consequently issued a declaratory judgment that Breyer was a United States citizen. We will affirm.[1]

## I.

The facts of this case have been extensively discussed elsewhere, especially in the District Court's bench opinion in the judgment now appealed. *See Breyer v. Meissner*, No. 97-6515, 2002 WL 31086985 (E.D. Pa. Sept. 18, 2002).[2] With a few exceptions not determinative here, the District Court's findings of "historical fact" have not been challenged. We detail the facts as they relate to the matters currently being appealed.

Johann Breyer was born in 1925 to an American-born mother and a non-citizen father in Nova Lesna, a small farming village located in what was then Czechoslovakia

---

1. We have appellate jurisdiction under 28 U.S.C. § 1291. We review the District Court's factual findings for clear error. *Edwards v. Wyatt*, 335 F.3d 261, 271 (3d Cir. 2003). We exercise plenary review over the District Court's conclusions of law. *Id.*

2. *See also, Breyer v. Meissner*, 214 F.3d 416 (3d Cir. 2000); *Breyer v. Meissner*, 41 F.3d 884 (3d Cir. 1994).

(and later became Slovakia). Although they resided in Czechoslovakia, the Breyer family was ethnically German ("*Volksdeutschen*"). Slovakia became a separate state in 1939 controlled by Germany, and thus allied with Germany during World War II. During that time, the political and social interests of the Slovak ethnic German population were represented by *Deutsche Partei* ("*DP*"), or German Party. The *DP* was a functional instrument of the Third Reich, but exerted no legal control over its members.

As the tides of war began to turn against Germany in 1942, the *Schutzstaffel* ("*SS*"), a Nazi political organization, coordinated with the *DP* to devise a plan to recruit Slovak *Volksdeutschen* for membership in the *Waffen SS*, a Nazi paramilitary organization. Breyer received a notification letter sent in the first wave of this recruiting drive instructing him to report for military service. Breyer asked the mayor of his town whether he was obligated to report as instructed. The mayor confirmed this obligation, and Breyer subsequently appeared for the required physical examination. Several months later, Breyer received a call-up notification that he had passed the examination, instructing him to report for induction into the *Waffen SS*. Breyer again approached the mayor who informed him that he was obligated to comply with the notification. But the mayor assured Breyer that he would work with local *DP* officials to secure Breyer's release if ultimately he were assigned to a distant post.

On February 10, 1943, Breyer was transported to the concentration camp at Buchenwald, Germany, where he was assigned to the *Totenkopf Sturmbann*, or Death's Head Battalion, in the *Waffen SS*. Upon completion of a six-week training program, seventeen-year-old Breyer swore an oath of allegiance to Adolf Hitler. Upon induction into the *Waffen SS*, Breyer was advised to abandon religion—a policy financially encouraged by waiver of the Reich's church tax —but he refused. Breyer also refused to join the new inductees in having his blood-type branded on his upper arm, a mark that would have permanently identified him as a member of the *Waffen SS*. When Breyer was asked in front of a group of new *SS* inductees whether he could shoot a person, he responded that he could not.

Consequently, he was assigned to a section of the concentration camp where prisoner escape was considered unlikely. He carried a weapon while on perimeter duty, but it was not always loaded. On May 30, 1943, shortly after the completion of his training, Breyer turned eighteen.

Whether Breyer voluntarily entered the *Waffen SS* is unclear. While there is evidence that Slovak *Volksdeutschen* were subject to some degree of compulsion to enter the *Waffen SS*, there is also evidence that membership was ultimately a voluntary choice. On balance, however, the District Court concluded that Breyer's entry into service was voluntary as a matter of fact, though involuntary as a matter of law as Breyer was under the age of eighteen at the time. *Id.* at *14. In any event, it is undisputed that once inducted in the *Waffen SS*, a solider was obligated to remain a member for the duration of the war, whether or not he voluntarily enlisted.

In or around December 1943, Breyer was granted a standard two-week home leave. He was told that if he did not return, his family would be gravely harmed. Breyer took his leave and returned as scheduled. In the spring of 1944, Breyer requested an emergency home leave after receiving word that his mother was ill. This request was denied, but Breyer wrote to inform his parents that he would come home "one way or another." The letter was intercepted by censors and interpreted as a threat of desertion. As punishment for that perceived threat, Breyer was transferred to another unit of the *Totenkopf Sturmbann* stationed at Auschwitz I, a slave labor camp in Poland. While there, Breyer maintained essentially the same responsibilities he held at Buchenwald. Breyer testified, and the District Court found, that he never harmed a prisoner at Buchenwald or Auschwitz. *Id.* at *9. He was aware, however, of the large-scale murder being committed at Auschwitz II, the nearby Nazi death camp.

During his time at the concentration camp, Breyer never attempted to transfer to another type of service or to a different unit. He did, however, request leave every week during his posting at Auschwitz. In April 1944, Franz Karmasin, head of the *DP* and Slovak State Secretary for Ethnic German Affairs, appealed to the *Waffen SS* for

Breyer's permanent release from service, urging that Breyer was needed to tend to the family farm on account of his parents' illness. That appeal was denied, but Breyer was eventually granted temporary home leave in August 1944.

Upon expiration of his scheduled leave, Breyer did not return to Auschwitz—an act of desertion. Although he never stayed at home, Breyer remained in the vicinity, hiding in nearby barns and in the surrounding woods, until at least December 1944 when Slovak *Volksdeutschen* in Nova Lesna began to evacuate ahead of the advancing Soviet army.

Breyer fled the town and attempted to rejoin his unit at Auschwitz. The District Court found that Breyer had done so because he feared being discovered by the Germans and shot as a deserter. *Id.* at *11. En route, he was informed that the Soviets already had reached the camps at Auschwitz and that his unit was engaged in combat with the Soviet army on the eastern front. Breyer subsequently rejoined his unit near Berlin as a forward observer. Breyer was wounded in March, 1945, but returned to combat three weeks later. On May 3, 1945, his unit surrendered to the Soviet army, whereupon he was shipped to a prisoner-of-war camp in the Czech Republic. Following his release, Breyer reunited with his family in Bavaria.

Breyer lived in Germany until 1952, when he applied for a United States visa under the Displaced Persons Act of 1948, Pub. L. No. 80-774, 62 Stat. 1009, as amended by Pub. L. No. 81-555, 64 Stat. 219 (1950). In his visa application, Breyer acknowledged his membership in the *Waffen SS*, but did not disclose his participation in the *Totenkopf Sturmbann*. After initially rejecting his application, the Displaced Persons Commission certified Breyer eligible for a visa in March, 1952. He immigrated to the United States the same year. He later filed a petition for naturalization and was naturalized as a United States citizen in November, 1957.

## II.

In 1992, the government filed an action to denaturalize Breyer because of his service as an armed *SS* guard at Buchenwald and Auschwitz. The government claimed that

Breyer's citizenship was illegally procured, or procured by concealment or wilful misrepresentation. Breyer responded that he derived United States citizenship at birth through his mother who was born in Philadelphia, Pennsylvania. Even if the 1957 naturalization could be set aside, Breyer argued, he was still a citizen by birth.

At the time of Breyer's birth, derivative citizenship was governed by Section 1993 of the Revised Statutes of 1874. Act of Dec. 1, 1873, tit. 25, § 1993 (superseded by Immigration and Nationality Act of 1952 § 301(a), 8 U.S.C. § 1401(1994)). Under that statute, foreign-born children whose fathers were United States citizens at the time of their birth derived United States citizenship.[3] The statute did not extend the same right of derivative citizenship to foreign-born children whose mothers were United States citizens. Breyer argued that the statute was unconstitutional as a violation of the Equal Protection Clause of the Fifth Amendment. He contended, therefore, that he should be granted citizenship retroactively under the statute.

The District Court granted partial summary judgment for the government with respect to Breyer's denaturalization. *United States v. Breyer*, 829 F. Supp. 773, 779 (E.D. Pa. 1993). But the District Court also determined that Section 1993 was unconstitutional on equal protection grounds. *Id.* at 781. At trial, the District Court found that Breyer's mother was born in the United States, and held that the

---

3. Section 1993 of the Revised Statutes of 1874 provides:

> All children heretofore born or hereafter born out of the limits and jurisdiction of the United States, whose fathers were or may be at the time of their birth citizens thereof, are declared to be citizens of the United States; but the rights of citizenship shall not descend to children whose fathers never resided in the United States.

Act of Dec. 1, 1873, tit. 25, § 1993 (superseded by Immigration and Nationality Act of 1952 § 301(a), 8 U.S.C. § 1401(1994)). In 1934, Congress amended Section 1993 to make it gender-neutral. Thereafter, the statute extended United States citizenship to children born outside of the United States "whose father or mother or both at the time of the birth of such child is a citizen of the United States." Act of May 24, 1934, ch. 344, § 1, 48 Stat. 797 (1934).

appropriate remedy for the unconstitutionality of the statute was to retroactively grant Breyer United States citizenship. *United States v. Breyer*, 841 F. Supp. 679, 685-86 (E.D. Pa. 1993). Nevertheless, the District Court refrained from granting citizenship after concluding that Breyer had failed to exhaust the required administrative remedies. *Id.* at 686.

We affirmed the holding that Breyer had illegally obtained his naturalization, finding that Breyer's wartime activities disqualified him from being a "displaced person" under the Displaced Persons Act. *United States v. Breyer*, 41 F.3d 884, 891 (3d Cir. 1994). But we vacated the portion of the decision addressing Breyer's derivative citizenship based upon the statute's unconstitutionality after concluding the District Court had exceeded its jurisdiction in deciding a constitutional issue it was unnecessary to reach. *Id.* at 893.

In 1994, Congress amended Section 1993 of the Immigration and Nationality Technical Corrections Act of 1994 ("INTCA"), granting citizenship retroactively to all foreign-born children of United States citizens who had previously resided in the United States. Pub. L. No. 103-416, 108 Stat. 4305, 4306 (codified as amended at 8 U.S.C.A. § 1401 (1994)). But Congress did not extend retroactive application to anyone who "was excluded from, or who would not have been eligible for admission to, the United States under the Displaced Persons Act of 1948." *Id.* Because Breyer was found ineligible for admission under the Displaced Persons Act, he was not entitled to retroactive application of § 1401.

The Immigration and Naturalization Service denied Breyer's application for citizenship in 1996. Shortly thereafter, the government initiated deportation proceedings. On October 21, 1997, Breyer filed a petition for declaratory judgment in the District Court, seeking a declaration of derivative citizenship based on his mother's American citizenship at the time of his birth. The District Court ruled that the citizenship rules applicable to Breyer, as modified by INTCA, did not violate the equal protection component of the Due Process Clause of the Fifth Amendment. *Breyer v. Meissner*, 23 F. Supp. 2d 521, 537 (E.D. Pa. 1998).

We reversed on appeal, concluding that section 101(c)(2) of the INTCA preserved the unconstitutional gender bias of Section 1993.[4] *Breyer v. Meissner*, 214 F.3d 416, 429 (3d Cir. 2000). Because fathers were entitled to pass citizenship to children who would be ineligible under the Displaced Person's Act, it was unconstitutionally discriminatory to deny mothers the ability to pass citizenship to their children, even when the children would not be entitled to naturalization. *Id.* at 428. Consequently, we held that Breyer was entitled to American citizenship from the date of his birth.[5] *Id.* at 429.

---

4. We reasoned that Section 101(c)(2) placed an additional burden on American mothers in transferring citizenship to their foreign-born children. Because Section 1993 granted citizenship to foreign-born children of American fathers, these children may have been aware of their citizenship during World War II. *Breyer*, 214 F.3d at 428. Therefore, foreign-born children of American fathers could lose their citizenship only by *intentionally* committing expatriating acts. *Id.; see also Vance v. Terrazas*, 444 U.S. 252 (1980). By contrast, foreign-born offspring of American mothers were prevented from obtaining American citizenship if they, with or without intent, committed similar expatriating acts. To subject "American women to this additional burden for the transmission of citizenship to their foreign-born offspring is in fundamental tension with the principle of equal protection." 214 F.3d at 428."

5. The government asks us to reconsider this holding in light of *Nguyen v. INS*, 533 U.S. 53 (2001). In *Nguyen*, the Supreme Court upheld a different gender-based distinction in the Immigration and Nationality Act governing the citizenship of foreign-born children. Section 1409 provides that foreign-born children born out of wedlock acquire citizenship from their mother. For such a child to acquire United States citizenship from a father, by contrast, the father must meet certain additional requirements, such as showing paternity by clear and convincing evidence and agreeing in writing to financially support the child. 8 U.S.C. § 1409(a).

The Court, in a five to four decision, upheld the provision based on two "important governmental objectives." 533 U.S. at 62. The first was proof of parentage, which the court noted is often much more difficult to establish with respect to fathers. *Id.* at 62-64. Second, the provision helps ensure that there is an "opportunity for a meaningful relationship between citizen parent and child," which does not necessarily result as a matter of "biological inevitability" in the case of unwed fathers. *Id.* at 65.

The question remained, however, whether Breyer had lost that citizenship as a result of his wartime activities by, in effect, voluntarily renouncing his citizenship. We remanded to the District Court to make additional findings "concerning the circumstances under which Breyer joined the *Waffen SS* and the Death's Head Battalion to determine if his actions constitute[d] a voluntary and unequivocal renunciation of any possible allegiance to the United States of America." *Id.* at 431.

Following a bench trial, the District Court ruled in Breyer's favor. It determined that Breyer did not voluntarily take any actions that could be expatriating. Because Breyer committed no voluntary expatriating act, the court concluded that he retained his United States citizenship. The government appealed.

### III.

### A.

The Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States . . . are citizens of the United States." U.S. Const. amend. XIV, § 1. "There is no indication in these words of a fleeting citizenship, good at the moment it is acquired but subject to destruction by the Government at any time. Rather the Amendment can most reasonably be read as defining a citizenship which a citizen keeps unless he voluntarily relinquishes it." *Afroyim v. Rusk*, 387 U.S. 253, 262 (1967). As such, United States citizenship obtained either by birth or legitimate naturalization cannot be lost unless the citizen voluntarily renounces his citizenship. *Vance v. Terrazas*, 444 U.S. 252, 261 (1980); *see also Afroyim*, 387 U.S. at 268. By statute, certain expatriating acts, if proven, are presumptively

---

Neither of these interests is implicated here, in a case in which it is the mother, not the father, who is saddled with the greater difficulty in transmitting citizenship. Accordingly, *Nguyen* does not disturb our holding with respect to § 1401, and we see no reason to—or basis for—reconsidering it at this time.

voluntary.[6] *See* 8 U.S.C. § 1481(b). This presumption may be rebutted by showing, by a preponderance of the evidence, that the expatriating act was involuntary. *Id.* However, the party claiming a loss of nationality has occurred, in this case the United States, bears the burden of proving by a preponderance of the evidence that the citizen voluntarily performed the act with the intent to relinquish his citizenship. 444 U.S. at 268; 8 U.S.C. § 1481(b). Evidence that the citizen voluntarily committed expatriating acts "may be highly persuasive . . . in the particular case of a purpose to abandon citizenship." 444 U.S. at 261 (citing *Nishikawa v. Dulles*, 356 U.S. 129, 139 (1958) (Black, J., concurring)).

The government contends the District Court committed legal error by failing to consider Breyer's state of mind when evaluating whether his service in the *Waffen SS* after his eighteenth birthday was involuntary. Moreover, the government argues that Breyer failed to establish the affirmative defense of duress and that his service in the *Waffen SS* was voluntary. We will address these arguments in turn.

### B.

During his service with the *Waffen SS*, Breyer had no knowledge that he was a United States citizen by virtue of his mother's citizenship. And there is no reason that he should have known that he might be granted citizenship retroactively more than a half century later. Nevertheless, the previous panel suggested that it was possible for Breyer to voluntarily renounce his citizenship despite that lack of knowledge, if his actions "constitute[d] a voluntary and unequivocal renunciation of any possible allegiance to the United States of America."[7] *Breyer*, 214 F.3d at 431.

---

6. Entering the armed forces of a foreign state engaged in hostilities against the United States is considered an expatriating act. *See* 8 U.S.C. § 1481(a)(3).

7. Breyer challenges the prior panel's conclusion that if his participation with the *Waffen SS* and oaths of allegiance to Nazi Germany were voluntary, he may have voluntarily and unequivocally renounced his

On remand, the District Court addressed only whether Breyer voluntarily served in the *Waffen SS* after his

American citizenship despite having no knowledge of that citizenship. The government responds that we are bound by the previous panel's conclusion under the law-of-the-case doctrine. *See, e.g.*, *Africa v. City of Philadelphia (In re City of Philadelphia Litig.)*, 158 F.3d 711, 717 (3d Cir. 1998) ("[O]ne panel of an appellate court generally will not reconsider questions that another panel has decided on a prior appeal in the same case."). Consequently, the government argues that if Breyer's service was voluntary, then he necessarily voluntarily renounced his citizenship.

As an initial matter, it is not clear that the previous panel's opinion should be construed in that way. The panel stated that "a voluntary oath of allegiance to a nation at war with the United States and to an organization of that warring nation that is committed to policies incompatible with the principles of American democracy and the rights of citizens protected by the American constitution—an organization such as the Death's Head Battalion—is an unequivocal renunciation of American citizenship whether or not the putative citizen is then aware that he has a right to American citizenship." *Breyer*, 214 F.3d at 431. Elsewhere, however, the same panel ruled that only if Breyer's service was voluntary, he "*may* have made . . . a disclaimer of allegiance to the United States." *Id.* (emphasis added). We think it unlikely the previous panel meant to conclude that every voluntary member of the Death's Head Battalion would necessarily have made such an unequivocal renunciation, regardless of other potentially relevant circumstances. Furthermore, the panel remanded for a finding not only on voluntariness, but also on whether Breyer's "actions constitute a voluntary and unequivocal renunciation of any possible allegiance to the United States of America." *Id.* The previous panel opinion could be read, therefore, as merely concluding that it would be *possible* for Breyer to voluntarily renounce his citizenship without knowledge of it. The Supreme Court has held that the ultimate question must always be whether the citizen voluntarily and purposefully abandoned citizenship. *Terrazas*, 444 U.S. at 261. Any interpretation of the previous panel's opinion should be consistent with that rule.

Breyer contends we are not bound by the previous panel and should hold that a citizen without knowledge of his citizenship is necessarily incapable of forming the necessary specific intent. It is arguable that, because it may have simply concluded that such intent was possible, the previous panel did not actually decide an issue that would be binding on future panels. In any event, we need not revisit the issue. Voluntary renunciation of citizenship requires, at a minimum, that any alleged expatriating act be performed voluntarily. We conclude the District Court committed no error in concluding that Breyer did not voluntarily perform the potentially expatriating actions.

eighteenth birthday. Breyer joined the *Waffen SS* when he was seventeen years old and, under the Nationality Act of 1940—the law governing expatriation at the time of Breyer's wartime activities—a citizen could not expatriate himself by military service or oaths of loyalty before his eighteenth birthday. Nationality Act of 1940 § 403(b), 54 Stat. 1170. Accordingly, the District Court held—and the government does not contest—that Breyer could not have expatriated himself by his actions before he turned eighteen. *Breyer*, 2002 WL 31086985, at \*14. The question then becomes whether he had done so by voluntarily remaining in the *Waffen SS* and swearing an oath of allegiance to the Third Reich after his eighteenth birthday. The District Court concluded that Breyer's service was not voluntary subsequent to his eighteenth birthday and therefore was not expatriating as a matter of law. *Id.* Central to this conclusion was the District Court's finding that even those persons who voluntarily enlisted were obligated to remain in the *Waffen SS* for the duration of the war. *Id.* at \*10.

The government does not dispute that Breyer was required to remain in the *Waffen SS* after he enlisted. Rather, the government argues that Breyer would have served in the *Waffen SS* regardless of any obligation or compulsion to do so. Even though his continuing membership in the *Waffen SS* was mandatory, this obligation allegedly did not cause Breyer to remain in the organization. Accordingly, the government contends the District Court committed legal error by failing to explicitly consider "causation" and assessing the voluntariness of Breyer's actions solely in terms of the choices (or lack thereof) available at the time.

We believe that voluntariness is most appropriately evaluated by considering the totality of the circumstances. By emphasizing causation as a determinative factor, the government draws inordinate attention to a single dimension of this broader inquiry. In this respect, the government overstates the so-called "causation element" and understates the extent to which the District Court implicitly addressed this issue. While the District Court's opinion cites the absence of choice as the reason for concluding that Breyer remained in the *Waffen SS*

involuntarily, read as a whole, it is clear that this was only one—albeit perhaps the most important—element in the District Court's analysis. Breyer's voluntary enlistment at the age of seventeen may provide some evidence that he served voluntarily several months later. But as the District Court correctly recognized, "[w]hile indicia that plaintiff voluntarily enlisted in the *Waffen SS* may entail some value as evidence that his continued service following his eighteenth birthday was similarly voluntary, they are by no means determinative of this latter issue." *Id.*, at *1.

Furthermore, the District Court made extensive findings with respect to matters relevant to a determination of voluntariness, none of which would be relevant if the District Court analyzed the issue in the manner the government suggests it did. While subject to different possible interpretations, Breyer's refusal to renounce his religion, to accept the distinctive *Waffen SS* blood-type brand, or to publicly commit to his ability to shoot a prisoner could be viewed by a fact-finder to establish a general reluctance to participate as a member of the *SS*. These same factors would not be relevant if Breyer's lack of choice was dispositive on the issue of voluntariness.

Importantly, the District Court extensively cited Breyer's attempts to secure leave and his ultimate desertion from the *Waffen SS*. It may be, as the government emphasizes, that Breyer could have done more to secure leave. But deserting his unit under what he believed to be penalty of execution suggests that Breyer's service was not voluntary.

In short, we are convinced the District Court adequately considered all of the relevant evidence in assessing whether Breyer's service was voluntary or involuntary. The District Court did not expressly address "causation" as a discrete factor in its voluntariness analysis. And there may be more to the voluntariness analysis than evaluating the citizen's ability to choose an alternate course of action. But it is clear that the District Court considered the critical issue of whether Breyer voluntarily relinquished his citizenship by analyzing the specific actions and circumstances related to his service in the *Waffen SS* for evidence of voluntariness or intent to abandon his United States citizenship.

## C.

The government also contends that Breyer failed to establish the affirmative defense of duress in the criminal context. As an initial matter, even if Breyer's defense can be labeled as one of "duress," we do not think the concept operates in the same way in expatriation proceedings. The government's language framing the issue on appeal— "[w]hether the district court misapplied the affirmative defense of duress by omitting the 'causal relationship' element"—misconstrues the analysis that applies in cases like this one. In this context, duress is not an affirmative defense, and there is no burden on Breyer to prove the elements of classic criminal duress. The burden rests on the government to prove voluntariness.

Furthermore, the Supreme Court has explicitly stated that "expatriation proceedings are *civil* in nature." *Terrazas*, 444 U.S. at 266 (emphasis added). As a civil proceeding, the standard for showing duress in an expatriation proceeding would be lower than in a criminal proceeding. *See United States v. One 107.9 Acre Parcel of Land*, 898 F.2d 396, 399 (3d Cir. 1990) ("We . . . assume that a showing of duress would require less demanding proof in a civil [as opposed to a criminal] context."). The issue in criminal cases is whether the involuntariness of the action is sufficient to remove culpability for the actions taken. In the expatriation context, the issue is different. Here we assess whether the citizen's actions demonstrate or express a voluntary intention to abandon citizenship.

Conceivably, certain voluntary actions that give rise to criminal liability may not be sufficiently voluntary to be expatriating. For example, in *Stipa v. Dulles*, 233 F.2d 551, 554 (3d Cir. 1956), this Court held that an American-born citizen who accepted a position as an auxiliary in the Italian Police Force "for the purpose of earning a livelihood" when no other jobs were available did not join voluntarily for expatriation purposes. But it does not necessarily follow that an American citizen would not be held culpable for criminal activities committed under similar conditions of economic hardship.

When a person performs an action, it is a fair inference that the action was performed voluntarily, because it can

be assumed, in the absence of evidence to the contrary, that he chose to do it. But when a person performs an action required by law and subject to coercive sanctions, there is ordinarily no longer a clear basis for the inference of voluntariness, because the actor may not have exercised his own free will. Establishing that one was conscripted, therefore, ordinarily defeats the basis for assuming that enlistment was voluntary. Consequently, a citizen might be able to satisfy the burden of establishing that an action was taken involuntarily—should other evidence not establish the contrary—by showing that it was compulsory.

Historically, mandatory military service has been treated as presumptively involuntary. "Conscription into the Army of a foreign government of one holding dual citizenship is sufficient to establish prima facie that his entry and service were involuntary." *Lehmann v. Acheson*, 206 F.2d 592, 594 (3d Cir. 1953) (citing *Perri v. Dulles*, 206 F.2d 586 (3d Cir. 1953)); *see also Nishikawa*, 356 U.S. at 136-37 (conscription into the Japanese army "adequately injected the issue of voluntariness and required the Government to sustain its burden of proving voluntary conduct"). For the most part, however, courts have made clear that this presumption of duress can be overcome. *See Nishikawa*, 356 U.S. at 136 (discussing the government's burden of responding once a showing of conscription had been made); *Lehmann*, 206 F.2d at 597-98 (considering government's attempt to rebut presumption). The Court of Appeals for the Second Circuit stated the issue clearly:

> The inference of duress which flows from conscription was doubtless subject to rebuttal by the defendant as, for instance, through evidence that, once conscripted, the soldier volunteered for service more onerous than that mandatorily imposed upon a conscript, or through evidence that Italian law in force at the time permitted the plaintiff to invoke his American citizenship as a ground for immunity from service to the Italian army, coupled with evidence that the plaintiff failed to invoke the immunity thus available to him.

*Augello v. Dulles*, 220 F.2d 344, 347 (2d Cir. 1955); *see also Acheson v. Maenza*, 202 F.2d 453, 458 (D.C. Cir. 1953) ("The additional factors of actual, in fact, duress and

coercion at the time of the conscription, on the one hand and of a free exercise of the will and of the mind, on the other, must bear heavily on the eventual answer.").

At the same time, evidence that the claimant would have enlisted without being required to do so can tip the balance in the government's favor. *See id.* ("Duress cannot be inferred from the mere fact of conscription. . . . [T]here must be consideration of the circumstances attending the service in the foreign country, and the reasonable inferences to be drawn therefrom."). The ultimate question remains whether, on balance, the expatriating action was voluntary, and the party claiming loss of nationality bears the burden of proving this by a preponderance of the evidence. 8 U.S.C. § 1481(b). Any number of factors may play a role in such an inquiry. As discussed, a fact finder need not specifically address a separate "causation" element in making this inquiry, but the determination must take into account the totality of the circumstances. Evidence of enlistment or conscription will often be the most important parts of this determination, but they are not the only relevant considerations.

Breyer was not involuntarily conscripted into the *Waffen SS*. The District Court found that Breyer's enlistment was voluntary, although he was not free to leave once he joined. *Breyer*, 2002 WL 31086985, at *10. Therefore, the critical question is whether Breyer voluntarily remained in the *Waffen SS* after his eighteenth birthday. In this regard, this case closely resembles *Perri v. Dulles*, 206 F.2d 586 (3d Cir. 1953). In *Perri*, a naturalized United States citizen was conscripted into the Italian army before the effective date of the Nationality Act of 1940, under which the government sought his expatriation. We declined to consider the district court's finding that the citizen voluntarily enlisted in the Italian army before the effective date of the statute. *Id.* at 589. As here, the sole question was whether the citizen voluntarily served in the armed forces of a foreign state after the effective date of the statute. We found that the citizen's military service under the terms of the original draft, without evidence that Italian law or military practice would have permitted the citizen to secure release, was "sufficient to establish prima facie that his service on and

after [the effective date of the statute] was involuntary," despite the District Court's finding that his initial enlistment had been voluntary. *Id.*

We think that Breyer's demonstrated inability to secure release from the *Waffen SS* and his subsequent desertion can be, for the reasons discussed, sufficient to defeat the presumption that his continued military service was voluntary.[8]

**D.**

Finally, the government contends that when all of the relevant facts are considered, the District Court erred in concluding that Breyer's service was involuntary. In this respect, we see no clear error in the District Court's factual findings, nor do we disagree with its conclusion that Breyer's service in the *Waffen SS* was involuntary.

As noted, the District Court made several findings relevant to the voluntariness inquiry. These findings do not paint a picture of a person committed to serve. Breyer's refusal to forsake his religion, his refusal to be branded with the distinctive mark of the *Waffen SS*, and his pledge before one hundred new *SS* recruits that he was incapable of shooting a prisoner suggest his general reluctance. Furthermore, his repeated attempts to secure both temporary and permanent release, followed by desertion from his unit, demonstrate Breyer's lack of commitment to service in the *Waffen SS*.

The government has suggested alternative inferences that could be drawn from these actions which support a finding of voluntariness. While these and other inferences may be reasonable ones, the District Court's findings, which we review for clear error, support the conclusion that Breyer's

---

8. Of course, evidence that the citizen initially entered military service voluntarily may support a finding of voluntariness later. The extent to which the enlistment was voluntary and the space of time between that enlistment and the time for determining expatriation will be relevant factors to be considered together with whatever other evidence the plaintiff and government produce tending to support a finding of voluntariness or involuntariness.

membership in the *Waffen SS* after his eighteenth birthday was involuntary.

There are, of course, some factual findings which support the government's position. The District Court's finding that Breyer voluntarily enlisted is perhaps the most significant. Breyer joined the *Waffen SS* only a matter of months before his eighteenth birthday, and one could ordinarily infer that such voluntariness would not change over a short period of time. But the District Court's determination that Breyer enlisted voluntarily is somewhat mitigated by contrary evidence. There is evidence that *Volksdeutschen* recruits faced significant pressure to join the *Waffen SS*, even if that pressure did not rise to the level of actual compulsion. And there are findings that could be viewed as indicia of Breyer's unwillingness to serve. When he received his enlistment notice, Breyer asked the mayor of his town whether he was obligated to go, and the mayor told him he was. The mayor subsequently told Breyer that he would try to get him released from service, if Breyer were assigned to a distant post. So even if Breyer enlisted voluntarily, there is evidence that supports the District Court's conclusion that Breyer remained in the *Waffen SS* only because he had no other choice.

Perhaps the fact which most supports the conclusion that Breyer's service was voluntary is Breyer's decision to return to his unit after he deserted. But the District Court found that Breyer sought to return to his unit because he feared he would be shot as a deserter by the Germans if he was discovered. *Breyer*, 2002 WL 31086985, at *10. This finding is sufficient to rebut a contrary inference. At the time Breyer returned to his unit, Allied armies were approaching Germany from all sides. There is no evidence of any other place Breyer safely could have gone. It is consistent with the evidence that Breyer thought the safest place for him was with his unit. If so, then his return was not voluntary in the sense that it might represent an intentional relinquishment of United States citizenship. Nor would his return represent substantial evidence of earlier voluntary service.

After reviewing the record, we see no clear errors of fact and no erroneous conclusions of law.

## IV.

For the foregoing reasons, we will affirm the judgment of the District Court.

A True Copy:
  Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*